32 P.3d 52

Charles F. SCHEFKE, Plaintiff–
Appellee/Cross–Appellant,

v.

RELIABLE COLLECTION AGENCY,
LTD., Pacific Medical Collections, Inc.,
Defendants–Appellants/Cross–Appellees,

and

Jonathan Kirschner, Fred Kirschner,
Defendants–Cross–Appellees,

and

John Does 1–10, Defendants.

No. 21827.

Supreme Court of Hawai'i.

Sept. 21, 2001.

As Amended Oct. 11, 2001.

Norman K.K. Lau and Allison M. Fujita, on the briefs, for plaintiff-appellee/ cross-appellant.

Robert E. Chapman and Mary Martin (Stanton Clay Chapman Crumpton & Iwamura), on the briefs, for defendants-appellants/cross-appellees and defendants-cross-appellees.

John Ishihara, Chief Counsel, for Amicus Curiae Hawaiʻi Civil Rights Commission.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

On the complaint of Plaintiff–Appellee/Cross–Appellant Charles F. Schefke (Plaintiff) against Defendants–Appellants/Cross–Appellees Reliable Collection Agency, Ltd. (Reliable) and Pacific Medical Collections, Inc. (Pacific) (collectively "Defendants") and Defendants–Cross–Appellees Jonathan Kirschner (Jonathan) and Fred Kirschner (Fred) for recovery of unpaid wages, compensation discrimination based on age, and retaliation for filing of a discrimination claim with the Hawaiʻi Civil Rights Commission (the HCRC), we affirm (1) the jury's award for unpaid wages, (2) the jury's award for a statutory penalty on the unpaid wages, (3) the jury's punitive damage award on Plaintiff's retaliation claim, (4) the denial by the first circuit court (the court)[1] of Defendants' request for jury instructions on waiver and laches pertaining to the unpaid wage claim, and (5) the court's directed verdict in favor of Defendants on the compensation discrimination claim. However, we vacate and remand (1) the court's directed verdict in favor of Jonathan and Fred on Plaintiff's claim that they were individually liable on the retaliation claim and (2) the court's order on attorney's fees and costs. On Defendants' cross-claim for unpaid loans, we affirm the principal amount awarded, but reverse the jury's award of interest on the loans.

I.

The following evidence was adduced at trial. Reliable and Pacific were separate Hawaiʻi corporations operating as collection agencies at the same principal place of business. Joe Leder, who had been a co-owner of Reliable since 1956, was the president of Reliable between 1979 and 1991, and was the president of Pacific between 1988 and 1994. Jonathan was a 20% owner of Reliable and its vice president until 1991 when he became the president. Fred, Jonathan's father, owned 80% of the stock of RECOA, a California corporation that owned 80% of Reliable.

Reliable hired Plaintiff, who was then fifty-six years old, on October 16, 1986. After Pacific was incorporated in March 1988, Plaintiff also started to work at Pacific. At Reliable and Pacific, collectors were assigned to certain "desks." Defendants assigned each desk a letter and a number to designate whether it belonged to Reliable or Pacific

1. The Honorable Dan T. Kochi presided over this case.

and to indicate the type of accounts handled by a desk. The letter "K" referred to Reliable and "J" referred to Pacific. For example, the J–2 desk was a Pacific desk assigned accounts over $3,500. The record does not indicate the significance of the assigned number.

Plaintiff explained that a "collection desk" is worked by a regular collector. A regular collector contacts debtors and attempts to collect money from them. If the attempts fail, the regular collector turns the accounts over to the "legal desk." The legal collector monitors the processing of these accounts through the court system, consults with attorneys, and attempts to resolve the matters before judgment. After judgment, the legal collector collects the debts through wage garnishment. Plaintiff worked on both collection and legal desks.

Plaintiff received loans from Pacific in the amounts of $1,500 and $2,700 in January and July 1992, respectively. Pacific did not charge any interest on the loans. Plaintiff did not repay the $4,200 in loans.

On October 23, 1992, Plaintiff, dissatisfied with his salary and commissions, filed complaints pursuant to Hawai'i Revised Statutes (HRS) § 368–11 (1993)[2] with the HCRC[3] against Defendants. Plaintiff was sixty-two years old at the time. In the HCRC complaints, Plaintiff alleged discrimination on the basis of unequal pay because of his age.

The HCRC sent letters[4] to Plaintiff on December 2, 1992, stating that his discrimination cases would be closed because Plaintiff had elected court action, and that he had the right to file a private lawsuit.[5] The HCRC sent copies of the letters to Reliable, Pacific, Jonathan, and Defendants' counsel.

On December 4, 1992, Defendants received from the HCRC a copy of Plaintiff's right-to-sue letter. A letter from Defendants' counsel, hand-delivered to Plaintiff, acknowledged receipt of the letter and requested notification of any desire on the part of Plaintiff to meet informally with Defendants' counsel.

2. HRS § 368–11 provides in pertinent part as follows:

> **Complaint against unlawful discrimination.** (a) The [HCRC] shall have jurisdiction over the subject of discriminatory practices made unlawful by chapters 489, 515, part I of chapter 378, and this chapter. *Any individual claiming to be aggrieved by an alleged unlawful discriminatory practice may file with the commission's executive director a complaint* in writing that shall state the name and address of the person or party alleged to have committed the unlawful discriminatory practice complained of, set forth the particulars thereof, and contain other information as may be required by the commission. The attorney general, or the commission upon its own initiative may, in like manner, make and file a complaint.
>
> . . . .
>
> (d) For the purposes of this chapter "unlawful discriminatory practice" means an unfair discriminatory practice or like terms, as may be. used in chapters 489, 515, *or part I of chapter 378.*

(Emphases added.)

3. HRS § 378–4 (1993) states in part that "[t]he *[HCRC] shall have jurisdiction over the subject of discriminatory practices made unlawful by this part [ (Part I, Discriminatory Practices) ]*" and that "[a]ny individual claiming to be aggrieved by an alleged unlawful discriminatory practice may file with the commission a complaint in accordance with the procedure established under chapter 368." (Emphasis added.)

4. The letters state that the investigator assigned to handle Plaintiff's complaint recommended that "the case be closed on the basis of [Plaintiff's] elected court action" and that Plaintiff's complaint would be dismissed pursuant to Hawai'i Administrative Rules (HAR) § 12–46–8. The record does not indicate the circumstances under which Plaintiff communicated his election.

> HAR § 12–46–8 provides as follows:
>
> **Withdrawal of complaint.** (a) Upon request of the complainant, a complaint, or any part thereof, may be withdrawn only if the written consent of the commission's executive director is obtained.
>
> (b) When requesting withdrawal of a complaint, the complainant shall:
> (1) Submit the request in writing;
> (2) Set forth fully the reasons for the request; and
> (3) Sign the request.
>
> (c) The commission's executive director shall notify the respondent of the withdrawal.

5. HRS § 368–12 (1993) states in pertinent part that "[t]he commission may issue a notice of right to sue upon written request of the complainant [and w]ithin ninety days after receipt of a notice of right to sue, the complainant may bring a civil action under this chapter." Under the provisions of HRS §§ 368–11, 368–12, and 378–4, Plaintiff could not bring his compensation discrimination claim until he received a notice of right to sue.

On December 4, 1992, Defendants also changed Reliable and Pacific's locks. Jonathan and Leder testified that the locks were changed because of a break-in of their offices and other offices in the same building in November 1992. Plaintiff did not receive new keys although he had had keys for five-and-a-half years. Only Jonathan and Leder received keys to the new locks.

On December 15, 1992, Plaintiff did not receive a Christmas bonus for the first time since his employment with Reliable and Pacific began.[6] Fred testified that a few other employees had not received a bonus. Plaintiff related that at a December 16, 1992 meeting among Plaintiff, Jonathan, Fred, and Defendants' counsel to discuss Plaintiff's compensation discrimination complaint, Fred declared that he had told Jonathan not to give a Christmas bonus to Plaintiff because Plaintiff had "stabbed him in the back" by filing the discrimination complaint.

On February 12, 1993, Plaintiff filed a second round of complaints with the HCRC, alleging that the loss of key privileges, denial of a Christmas bonus, and Fred's "bonus" statement constituted retaliation for having filed the complaints. Plaintiff received letters dated February 18, 1993 from the HCRC confirming that inasmuch as Plaintiff had withdrawn these complaints and elected court action, his retaliation cases would be closed and that he had the right to file a private lawsuit.[7] The HCRC sent copies of the letters to Leder and Jonathan.

**6.** In 1991, Plaintiff received a Christmas bonus in the amount of $750.

**7.** See *supra* note 5.

**8.** See *infra* at 420–21, 32 P.3d at 64–65.

**9.** See *infra* at at 424–25, 32 P.3d at 68–69.

**10.** "The [COBRA] amended the Employee Retirement Income Security Act of 1974 (ERISA) to permit a beneficiary of an employer's group health plan to elect continuing coverage when he [or she] might otherwise lose that benefit because of a 'qualifying event,' such as the termination of employment." *Geissal v. Moore Medical Corp.,* 524 U.S. 74, 75, 118 S.Ct. 1869, 141 L.Ed.2d 64 (1998). Subsection (a) of 29 U.S.C. § 1161 (1999) provides as follows:

## II.

On February 26, 1993, Plaintiff filed a complaint in the court against Defendants, Jonathan, and Fred. He retained counsel on a one-third contingency fee basis. Plaintiff alleged the following claims: (1) breach of contract, (2) compensation · discrimination based on age under HRS § 378–2(1)(A) (1993), (3) unpaid wages under HRS § 388–2(a) and (b) (1993),[8] (4) retaliation under HRS § 378–2(2) and (3) (1998),[9] and (5) fraud, misrepresentation and/or deceit. Plaintiff later voluntarily dismissed the fifth group of claims.

Pacific, Reliable, and Jonathan filed counterclaims on March 22, 1993, alleging fraud, interference with business, punitive damages, and failure to repay the $4,200 loan. The first three counterclaims were later voluntarily dismissed, leaving only the loan counterclaim.

On February 13, 1993, Plaintiff left work on workers' compensation leave because his physician told him that he had carpal tunnel syndrome and required surgery. On February 15, 1993, Defendants' worker's compensation insurance adjuster notified Plaintiff that Pacific had denied his workers' compensation claim. After Plaintiff appealed the denial to the Department of Labor and Industrial Relations, the claim was retroactively accepted on May 24, 1993. On May 28, 1993, Pacific sent a form entitled "Notice of [Consolidated Omnibus Budget Reconciliation Act (CO-BRA)[10]] Qualifying Event From Employer"

> Plans must provide continuing coverage to certain individuals
> (a) In general
> The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation cover-
> .age under the plan.
> 29 U.S.C. § 1163 (1999) provides a list of qualifying events which instigate a pending loss of health insurance coverage. The statute provides in pertinent part as follows:
> Qualifying event
> For purposes of this part, the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required un-

("COBRA Qualifying Notice") to its health insurance carrier. The notice stated, in pertinent part, as follows:

Date: 5/28/93

To: Plan Administrator
The Queen's Health Care Plan, Inc.

From: Pacific Medical Collections Group # 501
Employer Name

Re: Charles Schefke
Name of employee Covered by the Plan

. . . .

This is to inform you of an event which qualifies the above employee for continuation of benefits coverage.

Date of event: 5/12/93

Last month for which employer is making contribution: 5/93

Nature of event (check one):

a) _____ Termination of employment, due to retirement.

b) X Termination of employment, due to quit, layoff, or any other reason.

. . . .

On June 10, 1993, Defendants' insurance carrier sent Plaintiff a form entitled "Notice of Eligibility for Continued Health Plan Coverage 'COBRA Rights'" ("COBRA Eligibility Notice"). The document stated in pertinent part that "[y]our group health coverage terminates as of 5/31/93 *due to termination of employment* on 5/12/93." (Emphasis added.) However, Plaintiff apparently did return to work on April 4, 1994.

The events which took place between Plaintiff's receipt of the COBRA Eligibility Notice and April 4, 1994 were not introduced at the trial. As part of their motion for new trial, Defendants produced letters with respect to such events. The facts following are taken from those letters.

On January 26, 1994, Defendants' workers' compensation adjuster contacted Pacific, seeking to assist Plaintiff in returning to work. Plaintiff's counsel asked that all contact be with him, not Plaintiff. Defendants'

counsel notified the adjuster that Pacific had found light duty work for Plaintiff. The adjuster, in turn, informed Plaintiff's counsel of this fact. Plaintiff's counsel represented that Plaintiff would report to work on March 25, 1994, but stated that Plaintiff would not be able to operate a keyboard.

Two days later, Plaintiff's counsel sent another letter to the adjuster, declaring that Plaintiff would not report to work on March 25, 1994 because his physician had said Plaintiff could not return even to a light duty position. The adjuster disagreed with Plaintiff's counsel and explained that an enclosed copy of Plaintiff's physician's report dated March 18, 1994 disclosed Plaintiff was able to do such work starting at four hours per day. Plaintiff's counsel then informed the adjuster that Plaintiff would report to Pacific on April 4, 1994.

Jonathan testified that Plaintiff reported to work on April 4, 1994 with his arm in a sling, said that he was unable to use a computer, disputed his physician's work release, and left shortly thereafter. Plaintiff maintained that Defendants did not contact him after May 1993 when he was "terminated," or after June 1995 when he was released from workers' compensation.

III.

In a November 23, 1994 discovery conference order, the court ordered Defendants to produce, *inter alia*, "[m]onthly statements showing the gross collections for Pacific's J[-]2, J[-]7, J[-]8 and J[-]40 desks for each month Plaintiff worked at those desks for the period January 1, 1989 through February 28, 1993." On March 14, 1997, Plaintiff moved to compel compliance with the court's order since Defendants failed to produce the statements for the J-2, J-7, and J-8 desks. On April 3, 1997, the court granted the motion. Defendants produced documents for the J-2 desk for the period between April 1991 and June 1991, but not any other documents.

der this part, would result in the loss of coverage of a qualified beneficiary:
. . . .

(2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

## IV.

Jury trial in the case was conducted from April 8, 1997 to April 16, 1997. At the end of Plaintiff's case, Defendants, Jonathan, and Fred moved for directed verdicts as to Plaintiff's claims for compensation discrimination and as to Jonathan's and Fred's individual liability. The court granted Defendants' motion. The court also granted the directed verdict as to Jonathan and Fred.

On April 16, 1997, the jury returned a special verdict. As to Plaintiff's unpaid wage claim, the jury awarded Plaintiff $26,696 from Reliable and $80,086 from Pacific. The jury also awarded $2,136 from Reliable and $6,407 from Pacific pursuant to HRS § 388–10(a) (1993) as a penalty for the unpaid wages. As to Plaintiff's retaliation claim, the jury found that Reliable did not retaliate, but Pacific did, and awarded $300,000 punitive damages to Plaintiff from Pacific. The jury also found Plaintiff owed Pacific $4,536 as repayment for the loan made to him.

■ On May 7, 1997, Plaintiff moved for a statutory award of attorney's fees,[11] costs, and prejudgment interest[12] under HRS § 378–5(c) (1993),[13] requesting that the amount of attorney's fees should be equal to the "lodestar" amount[14] enhanced by a 2.0 multiplier or one-third of the total jury verdict.

On May 29, 1997, Defendants filed a motion for new trial and/or to amend judgment pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 59(a) and (e) (1997),[15] arguing that (1) the punitive damage award was against the weight of the evidence and that (2) the unpaid wage and punitive damage awards were excessive. On June 10, 1997, Defendants filed a supplemental memorandum in support of their motion and requested the court, pursuant to HRCP Rule 60(b) (1997),[16] to set aside the anticipated judgment upon the jury verdict, alleging fraud on the court and attaching as support for this motion the letters referred to *supra* that were exchanged among the workers' compensation adjuster, Defendants' counsel, and Plaintiff's counsel regarding Plaintiff's return to work. The court denied Defendants' motion on June 27, 1997.

On September 2, 1997, the court awarded attorney's fees and costs under HRS §§ 378–5(c) and 388–11(c) (Supp.1997).[17] The court denied Plaintiff's request for the application of a multiplier or for one-third of the total jury verdict as attorney's fees, but awarded fees based on the "lodestar" method. The court also denied Plaintiff's request for para-

---

11. As stated *supra*, Plaintiff's counsel was retained on a one-third contingency fee basis.

12. Plaintiff originally requested an award of prejudgment interest on the entire jury verdict, but modified the request by seeking 10% prejudgment interest only on the unpaid wage award.

13. *See infra* note 69.

14. The "lodestar" amount equals the number of hours Plaintiff's counsel spent on this case multiplied by his hourly rate. *Chun v. Board of Trustees of Employees' Retirement Sys. of State of Hawai'i*, 92 Hawai'i 432, 434 n. 1, 992 P.2d 127, 129 n. 1 (2000).

15. HRCP Rule 59(a) and (e) provided in pertinent part as follows:

> **Rule 59. New Trials; amendment of judgments.**
> (a) **Grounds.** A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the State[.]

> . . . .
> (e) **Motion to Alter or Amend Judgment.** A motion to alter or amend a judgment shall be served not later than 10 days after entry of the judgment.

16. HRCP Rule 60(b) provided in pertinent part as follows:

> **Rule 60. Relief from Judgment or Order.**
> . . . .
> (b) **Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.**
> ... A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or *to set aside a judgment for fraud upon the court*. ...
> (Emphasis added.)

17. Plaintiff moved for attorney's fees and costs only under HRS § 378–5(c). However, the court referred to HRS § 388–11(c) in addition to HRS § 378–5(c) in its order. *See infra* notes 69 and 70

legal fees, prejudgment interest on the unpaid wage award, parking fees, costs for a transcript, and sales tax on "expenses." [18]

On August 17, 1998, Defendants filed their notice of appeal,[19] and on August 26, 1998, Plaintiff cross-appealed.

## V.

■ Defendants and Plaintiff contend that this court should disregard the other's appeal because their statements of points of error do not comply with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (1996).[20] "[S]uch noncompliance offers sufficient grounds for the dismissal of the appeal." *Housing Fin. & Dev. Corp. v. Ferguson*, 91 Hawai'i 81, 85, 979 P.2d 1107, 1111 (1999) (citing *Bettencourt v. Bettencourt*, 80 Hawai'i 225, 228, 909 P.2d 553, 556 (1995)). "Nonetheless, inasmuch as 'this court has consistently adhered to the policy of affording litigants the opportunity to have their cases heard on the merits, where possible,' we address the issues [the parties raise] on the merits." *Id.* at 85–86, 979 P.2d at 1111–

12 (quoting *Bettencourt*, 80 Hawai'i at 230, 909 P.2d at 558).

## VI.

We consider in the following order the matters raised on appeal:[21] (1) the amount of the unpaid wage award; (2) the jury instructions on the unpaid wage claim; (3) the penalty on unpaid wages; (4) the punitive damage award on the retaliation claim; (5) the alleged fraud on the court; (6) allegation of an unpleaded issue under HRCP Rule 15; (7) interest on the loans; (8) the directed verdict on compensation discrimination; (9) the directed verdict on individual liability; (10) the attorney's fees award; (11) the paralegal fees award; and (12) the order on costs.

## VII.

■ Plaintiff's claim for unpaid wages was brought pursuant to HRS § 388–2(a) and (b). The provisions provide in pertinent part as follows:

**Semimonthly payday.** (a) Every employer shall pay all wages due to the em-

---

18. Plaintiff contends that the court erred in denying "sales tax on expenses." Since we vacate the court's denial of some of the requested costs based on the fact that the court did not explain the rationale for the exclusions, we do not reach the merits of his contention. *See* discussion *infra* part XXIV.

19. Prior to Defendants' appeal from the August 13, 1998 final judgment, this court filed two orders of dismissal of earlier appeals. On October 15, 1997, Defendants filed a notice of appeal which was dismissed by this court on December 12, 1997 for lack of jurisdiction. Defendants again filed a notice of appeal on March 30, 1998, that was again dismissed for lack of jurisdiction on June 26, 1998.

20. Prior to amendments in 1999 and 2000, HRAP Rule 28(b)(4) in pertinent part provided as follows:

 **Rule 28. Briefs.**
 . . . .
 (b) . . . [T]he appellant shall file an opening brief, containing the following sections in the order here indicated:
 . . . .
 (4) A concise statement of the points of error on which appellant intends to rely set forth in separate, numbered paragraphs. Each point shall refer to the alleged error committed by the court or agency upon which appellant in-

tends to rely. The point shall show where in the record the alleged error occurred and where it was objected to[.]

21. Defendants raised the following points of error: (1) the court abused its discretion in denying Defendants' motion for new trial because (a) Plaintiff committed fraud on the court, (b) there was no basis to award punitive damages, and (c) the punitive damage award was excessive; and (2) the case must be remanded for a new trial because (a) the court committed reversible error by denying Defendants' jury instructions on the defenses of waiver and laches, (b) the unpaid wage award was speculative and not supported by evidence, and (c) Plaintiff proffered prejudicial comments concerning Defendants' failure to comply with court orders.

 Plaintiff raised the following points of error: (1) the court erred in granting Defendants' motion for a directed verdict on Plaintiff's compensation discrimination claim and the claim of individual liability for Jonathan and Fred; (2) the award of unpaid wages should include a penalty amounting to the amount of unpaid wages and thus be doubled; (3) the jury erred in awarding Pacific $4,536 when Plaintiff received loans of $4,200 without any interest; (4) the court erred in not awarding paralegal fees to Plaintiff as a component of attorney's fees; and (5) the court erred in not allowing enhancement of attorney's fees.

ployer's employees at least twice during each calendar month, on regular paydays. designated in advance by the employer. . . .

(b) The earned wages of all employees shall be due and payable within seven days after the end of each pay period.

## A.

"Unpaid wages" consisted of unpaid compensation as derived from salaries and commissions Plaintiff believed were owed him. To determine commissions, Plaintiff multiplied the applicable commission rate to the total amount collected on each desk he worked. He then added the total commissions to the salaries allegedly promised him. By calculating the difference between the sum of commissions and salaries and the income derived from his W-2 tax forms,[22] Plaintiff arrived at the amount of his unpaid wage claim.

Based on this method, Plaintiff claimed, as unpaid wages, $12,805.24 in 1988, $30,096.54 in 1989, $53,547.72 in 1990, $70,515.32 in 1991, $81,905.24 in 1992, and $4,362.26 in January and February 1993. Plaintiff did not separate unpaid wage amounts as between Reliable and Pacific. The total unpaid wages claimed by Plaintiff amounted to $253,232.32.

The evidence following was adduced at trial as to desks Plaintiff worked, his salaries, commission rates, and amounts collected. Plaintiff was in charge of the K–30 and J–40 desks, which were designated "legal desks." He started work on the K–30 desk at Reli-

able in 1988 and on the J–40 desk at Pacific in July 1988. In July 1990, Plaintiff started work on the J–2, J–7, and J–8 desks at Pacific in addition to the K–30 and J–40 desks. He also worked on the K–31 desk in July 1991 and on the K–33 desk in October 1992. According to Plaintiff, it was possible to work on five or six desks at the same time by writing a computer program. David Loando, a co-worker, testified that the accounts at the J–2 desk "primarily" contained Plaintiff's initials [23] and Margaret Miyasaki, another co-worker, recounted that she saw Plaintiff's initials on accounts at the J–7 and J–8 desks when she started work on those desks.

The monthly salaries for the K–30 and J–40 desks were $1,200 and $2,500, respectively. In April 1989, Plaintiff's salary for working on Reliable's K–30 desk was increased from $1,200 to $1,500. However, in October 1991, his monthly salary at Reliable was reduced to $700 and at Pacific to $1,800. Plaintiff's testimony and a note stating that Plaintiff's salary would be raised to $1,500 were used to support these facts.

As related by Plaintiff, Jonathan promised Plaintiff that he would receive commissions at the rate of 3% of every dollar Plaintiff collected between $30,000 and $40,000 and 5% of every dollar over $40,000. Furthermore, in October 1991, the commission rate for Pacific's J–40 desk was increased to 10% of every dollar collected over $12,500.

Some of the amounts reflected as collected on each desk were amounts based on Plaintiff's handwritten chart,[24] collector perfor-

---

**22.** A W-2 form, entitled "Form W-2 Wage and Tax Statement," is "[a] statement of earnings and taxes withheld ... during the year, prepared for and provided to each employee and also filed with the Internal Revenue Service [ (IRS)] by [an] employer." *Black's Law Dictionary* 1613 (6th ed.1990).

According to the W-2 forms, Plaintiff earned $25,219.19 at Reliable in 1988, $22,743.04 at Reliable in 1989, $8,388.33 at Reliable and $18,948.67 at Pacific in 1990, $8,925.00 at Reliable and $23,532.97 at Pacific in 1991, and $8,530.00 at Reliable and $30,913.27 at Pacific in 1992. According to Plaintiff's pay stubs, he earned $4,765.69 in January and February 1993.

**23.** Collectors at Pacific and Reliable would append their initials to notes on the computer when they had worked on a particular account. Loan-

do testified that when a collector was absent from work, another collector would handle incoming calls for that person's desk and would make notations on the computer system. According to Loando, the collector who handled incoming calls could not take credit for the account, and Jonathan's authorization was required for a collector to be credited for money collected on desks not assigned to that collector. The fact that Defendants' employees saw Plaintiff's initials on accounts at their desks indicates that Plaintiff worked on those desks at least to a certain extent.

**24.** This monthly chart contained the total amounts collected on the K–30 desk each month. Plaintiff created the chart using figures from the daily transaction reports showing the amounts collected on each day.

mance reports,[25] and daily transaction reports. Because the total amounts collected on the J–2, J–7, and J–8 desks were not available, *see* discussion *supra* part III, Plaintiff estimated[26] the amounts collected on those desks, relying on Loando's testimony[27] and Miyasaki's testimony. As stated, the total amount claimed exceeded $250,000.

### B.

 Defendants moved for a new trial on the ground, *inter alia*, that the unpaid wage award was not supported by evidence, but the court denied the motion. " 'Both the grant and the denial of a motion for new trial is within the trial court's discretion, and [this court] will not reverse that decision absent a clear abuse of discretion.' " *In re Estate of Herbert,* 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999) (quoting *Carr v. Strode,* 79 Hawai'i 475, 488, 904 P.2d 489, 502 (1995) (citations omitted)). " 'A . . . court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *Id.* (quoting *Abastillas v. Kekona,* 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (citations omitted)).

 Here, Defendants maintain that assuming Plaintiff did indeed work on all the desks mentioned, Jonathan and Loando declared that Plaintiff worked them only sporadically and not on a full-time basis. The jury awarded Plaintiff less than one-half of the amount claimed. It heard the witnesses' testimony and considered the evidence. " '[A]n appellate court will not pass upon issues dependent upon the credibility of wit-

nesses and the weight of the evidence.' " *Credit Assocs. of Maui, Ltd. v. Brooks,* 90 Hawai'i 371, 376, 978 P.2d 809, 814 (1999) (quoting *Steinberg v. Hoshijo,* 88 Hawai'i 10, 18, 960 P.2d 1218, 1226 (1998) (citation omitted)). Under these circumstances, we do not believe that the court abused its discretion in denying Defendants' motion for a new trial on the unpaid wage claim. Accordingly, we affirm the award of unpaid wages.

### C.

 In conjunction with the claim of unpaid wages, Defendants contend that the court erred in denying Defendants' waiver and laches instructions. Defendants maintain that Plaintiff assisted other employees in arguing that they had been under-compensated, but did not himself confront Defendants with any specific accusation that he was refused proper compensation.[28] They assert that the jury should have been allowed to consider whether Plaintiff's purported inaction amounted to a waiver or to laches. We conclude that although Defendants' proposed jury instructions regarding waiver and laches were correct statements of law, they were not supported by the evidence.

 "[W]aiver is defined as an intentional relinquishment of . . . right[s] . . . and . . . may result from 'such conduct as warrants an inference of an intentional relinquishment of a known right.' " *Best Place, Inc. v. Penn Am. Ins. Co.,* 82 Hawai'i 120, 129, 920 P.2d 334, 353 (1996) (quoting *Wilart Assocs. v. Kapiolani Plaza Ltd.,* 7 Haw.App. 354, 359, 766 P.2d 1207, 1210 (1988) (citation omitted))

---

**25.** Collector performance reports state the total amount collected for a certain desk as of a certain date.

**26.** The amounts collected based on the collector performance reports produced by Defendants were $17,086.41, $11,818.34, and $16,226.70.

**27.** As to the collection amounts on the J–2 desk, Loando testified that he collected between $50,000 and $100,000 per month on the desk. Plaintiff estimated that he collected $75,000 on the J–2 desk based on Loando's testimony.

Defendants pointed out that Plaintiff had estimated collections on the J–2 desk at $25,000 a month in a letter dated November 18, 1992 from

Plaintiff to the HCRC. Plaintiff explained that his estimate increased at the time of trial because the witnesses' depositions and information submitted by Defendants refreshed his memory with respect to his more accurate figures.

**28.** Defendants do not point to specific facts supporting their contention, but there was testimony of how Plaintiff assisted others. For example, Plaintiff testified that, as a supervisor, he confronted Jonathan on behalf of Pearl Gains because Gains had complained many times about Jonathan's failure to keep his promise that he would give Gaines a pay raise when she reached seventy years of age. Gains died at age seventy-two without receiving the raise, according to Plaintiff.

(brackets omitted). In opposition to Defendant's position, Plaintiff testified that he complained to Jonathan four times about the unpaid wages, Jonathan told Plaintiff he would do something about it, but because nothing was done, he gave up complaining and subsequently contacted the HCRC in September 1992. No inference of an intentional relinquishment of unpaid wages can be drawn from such evidence. The fact that Plaintiff assisted others does not demonstrate that he voluntarily relinquished his own right to unpaid wages. Such a fact only indicated that Plaintiff believed other employees had such rights. Thus, nothing in the record supports the defense of waiver.

■ Under the doctrine of laches, "there must have been a[n unreasonable] delay by the plaintiff in bringing his [or her] claim," *Pelosi v. Wailea Ranch Estates,* 91 Hawai'i 478, 490, 985 P.2d 1045, 1057–58, *reconsideration denied,* 91 Hawai'i 478, 985 P.2d 1045 (1999) (citations omitted), and that such "delay must have resulted in prejudice to [the] defendant." *Nishitani v. Baker,* 82 Hawai'i 281, 288, 921 P.2d 1182, 1189 (App.1996). Assuming *arguendo* a delay took place, nothing in the facts indicates that Defendants were prejudiced because Plaintiff did not bring a suit against them earlier, and thus, Defendants were not entitled to an instruction on laches.

Because Defendants' proposed jury instructions regarding waiver and laches were not supported by the evidence, the remaining instructions given to the jury, when read as a whole, were not "prejudicially insufficient, erroneous, inconsistent, or misleading." *Estate of Herbert,* 90 Hawai'i at 467, 979 P.2d at 63 (citing *Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997)

(citations omitted)). The court did not commit error on this point.

### VIII.

■ In addition to unpaid wages, the jury awarded Plaintiff an additional $2,136 from Reliable and $6,407 from Pacific as penalties pursuant to HRS § 388–10(a). Plaintiff cross-appeals this award, arguing that the total penalty should be double the amount of unpaid wages, based on the language of the statute.[29]

■ HRS § 388–10(a) provided as follows:

> **Penalties.** (a) Civil. Any employer who fails to pay wages in accordance with this chapter without equitable justification shall be liable to the employee, in addition to the wages legally proven to be due, for a sum *up to* the amount of unpaid wages.[30]

(Emphasis added.) The legislature enacted HRS § 388–10(a) in 1977 to " 'encourage employers to pay wages promptly, reduce an employee's economic losses, and strengthen the law.' " *Arimizu v. Financial Sec. Ins. Co.,* 5 Haw.App. 106, 110, 679 P.2d 627, 631 (1984) (quoting Hse. Stand. Comm. Rep. No. 205, in 1977 House Journal, at 1374–75; Sen. Stand. Comm. Rep. No. 727, in 1977 Senate Journal, at 1160).

The court's instruction to the jury reflected the text of HRS § 388–10(a)[31]:

> If you find that the Plaintiff is entitled to wages which were not paid to him by a Defendant, and said Defendant fails to prove equitable justification for his [sic] failure to pay such wages, the Plaintiff is entitled *to a penalty from said Defendant up to the amount of the unpaid wages.*

(Emphasis added.) However, Plaintiff asserts that "the plain meaning of the jury

---

29. Plaintiff started working for Defendants in 1988 and left employment (or allegedly was terminated) in 1993. Thus, the statute in effect in 1993 is applicable. HRS § 388–10 was amended in 1994 and 1999.

30. After its amendment in 1994, HRS § 388–10(a) (1994) stated as follows:

> **Penalties.** (a) Civil. Any employer who fails to pay wages in accordance with this chapter without equitable justification shall be liable to the employee, in addition to the wages legally

proven to be due, for a sum up to the amount of unpaid wages *and interest at a rate of six per cent per year from the date the wages were due.* (Emphasis added.)

31. Plaintiff concedes that the jury instruction is the same as the statute except for the 6% interest provision. As noted earlier, the legislature added the 6% provision in a 1994 amendment. Thus, that provision does not apply to this case.

instruction and statute require the jury to award a penalty in an amount *equal to* the amount of wages found justly due to Plaintiff[,]" (emphasis added) and "there is a total difference of $98,239 that should be awarded. . . ."

■■■■■ " '[W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.' " *State v. Kalama*, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (internal quotation marks and citation omitted). HRS § 388–10 and the pertinent definition section, HRS § 388–1 (1993), do not define the phrase "up to." We may " 'resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined.' " *Kalama*, 94 Hawai'i at 63 n. 6, 8 P.3d at 1227 n. 6 (quoting *State v. Chen*, 77 Hawai'i 329, 337, 884 P.2d 392, 400 (App.1994) (brackets omitted)).

The phrase "up to" is defined as "to the limit of," *Webster's Third New Int'l Dictionary* 2519 (3d ed.1961), "as many as: as much as," *id.*, and is "used as a function word to indicate a limit or boundary." *Merriam Webster's Collegiate Dictionary* 1299 (10th ed.1993). Giving the phrase "up to" in HRS § 388–10 (1993) its plain and obvious meaning, we conclude that the statute authorized the jury discretion to award a penalty "to the limit" of the unpaid wages and, thus, also to award *less* than the unpaid wages as the penalty to be assessed.

■■■■ In 1999, the statute was amended as follows:

**Penalties.** (a) Civil. Any employer who fails to pay wages in accordance with this chapter without equitable justification shall be liable to the employee, in addition to the wages legally proven to be due, for a sum *equal to* the amount of unpaid wages and interest at a rate of six per cent per year from the date that the wages were due.

1999 Haw. Sess. L. Act 24, § 1, at 29 (emphasis added). As indicated in Act 24, the phrase "up to" was amended to "equal to."

The legislature adopted the amendment "to eliminate discretion in the amount of penalty assessed against an employer who fails to pay wages in a timely manner." Hse. Stand. Com. Rep. No. 643, in 1999 House Journal, at 1260. The fact that the legislature did so, demonstrates that prior to the amendment, the statute indeed afforded discretion to award an amount less than that of the unpaid wages as a penalty. "[S]ubsequent legislative history or amendments may be examined in order to confirm our interpretation of statutory provisions." *Bowers v. Alamo Rent–A–Car, Inc.*, 88 Hawai'i 274, 282, 965 P.2d 1274, 1282 (1998) (Ramil, J. concurring) (internal quotation marks and citation omitted).

Plaintiff contends, however, that another standing committee report declared that the legislature amended the statute to "clarify the original intent of the law that the amount of the penalty assessed against an employer who fails to pay wages in a timely manner should be equal to the amount of unpaid wages and interest of six per cent [sic]." [32] Sen. Stand. Com. Rep. No. 1383, in 1999 Senate Journal, at 1556. To the contrary, the legislature's desire to "clarify [its] original intent" by amending the words "up to" to "equal to" reveals that, prior to the amendment, the statute had been construed as permitting a penalty of less than the total amount of unpaid wages.

Under HRS § 388–10 as it read at the time of this case, the court was correct in instructing the jury that it could award Plaintiff up to the maximum of the wages unpaid as a penalty against Defendants. Plaintiff's contention has no merit in light of both the plain language and the legislative history of the statute.

### IX.

#### A.

On the punitive damages award for retaliation, the jury awarded Plaintiff $300,000 against Pacific.[33] Before considering Defen-

---

**32.** It appears this statement was made with respect to the 1994 version of · HRS § 388–10, because the 6% interest provision was incorporated in that year.

**33.** The relevant part of the completed special verdict form stated as follows:

dants' arguments on this award, we examine the statutory basis for this claim. Plaintiff's retaliation claim was based on HRS § 378–2(2) and (3), which provide in pertinent part as follows:

> **Discriminatory practices made unlawful; offenses defined.** It shall be an unlawful discriminatory practice:
>
> . . . .
>
> (2) *For any employer,* labor organization, or employment agency *to discharge, expel, or otherwise discriminate against any individual because the individual* has opposed any practice forbidden by this part or *has filed a complaint,* testified, or assisted *in any proceeding respecting the discriminatory practices prohibited under this part;*
>
> (3) *For any person whether an employer, employee, or not,* to aid, *abet, incite,* compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so[.]

(Emphases added.)

### B.

Not having previously dealt with a retaliation claim under HRS § 378–2(2) and (3), we may look, in construing HRS § 378–2, "to interpretations of analogous federal laws by the federal courts for guidance." *Shoppe v. Gucci Am., Inc.,* 94 Hawai'i 368, 377, 14 P.3d 1049, 1058 (2000) (citing *Furukawa,* 85 Hawai'i 7, 13, 936 P.2d 643, 649, *reconsideration denied,* 85 Hawai'i 196, 940 P.2d 403 (1997), and *Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n,* 89 Hawai'i 269, 279 n. 10, 971 P.2d 1104, 1114 n. 10 (1999) (citation omitted) (parenthetical explanations omitted)).

Under Title VII [34] of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–1 to 2000e–17 (1994), an analogous federal law, federal courts have held that, in a prima facie case of retaliation, "an employee must show that (1) he [or she] engaged in a protected activity; (2) his [or her] employer subjected him [or her] to an adverse employment action; and (3) a causal link exist[ed] between the protected activity and the adverse action." *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir.2000) (citing *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994)). "If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Id.* (citing *Steiner,* 25 F.3d at 1464–65). "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.* (citing *Steiner,* 25 F.3d at 1464–65).

This court has adopted the burden-shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in other types of HRS § 378–2 discrimination cases. *See Shoppe,* 94 Hawai'i at 378–81, 14 P.3d at 1059–62 (applying the *McDonnell Douglas* analysis to an age discrimination claim under HRS § 378–2); *Sam Teague,* 89 Hawai'i at 279,

---

5. Did either of the Defendants retaliate against Plaintiff for filing a complaint with the Hawaii Civil Rights Commission?
 a. Defendant [Reliable]
 Yes _____ No __X__
 b. Defendant [Pacific]
 Yes __X__ No _____
 . . .

6. For either of the Defendants for which you answered Yes in question 5, what amount of punitive damages, if any, are due to Plaintiff?
 a. Defendant [Reliable]
 $ 0 _____
 b. Defendant [Pacific]
 $ 300,000.00 .

Special verdict interrogatories with respect to punitive damages were not given by the court. Plaintiff's request for a specific jury instruction on termination was refused over his objection.

**34.** Title VII prohibits employers, employment agencies, and labor organizations from discriminating against any individual in the employment context based on the individual's race, color, religion, sex, or national origin. In relevant part, § 704(a) of Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he [or she] has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e–3(a).

971 P.2d at 1114 (applying the analysis to a HRS § 378–2 sex discrimination claim); *Furukawa*, 85 Hawaiʻi at 12–14, 936 P.2d at 648–50 (applying the analysis to a HRS § 378–2 race discrimination claim).

 Consistent with the approach under Title VII and the foregoing cases involving HRS § 378–2, we hold that a retaliation claim under HRS § 378–2(2) is subject to the following three-part test: (1) the plaintiff must first establish a prima facie case of such retaliation by demonstrating that (a) the plaintiff (i) "has opposed any practice forbidden by [HRS chapter 378, Employment Practices, Part I, Discriminatory Practices] or (ii) has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part," HRS § 378–2(2), (b) his or her "employer, labor organization, or employment agency [has] ... discharge[d], expel[led], or otherwise discriminate[d] against the plaintiff," *id.*, and (c) "a causal link [has] exist[ed] between the protected activity and the adverse action," *Ray*, 217 F.3d at 1240 (citation omitted); (2) if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action, *see id.*; *Shoppe*, 94 Hawaiʻi at 378–79, 14 P.3d at 1059–60; and (3) if the defendant articulates such a reason, the burden shifts back to the plaintiff to show evidence demonstrating that the reason given by the defendant is pretextual. *See Ray, supra; Shoppe*, 94 Hawaiʻi at 379, 14 P.3d at 1060. The instructions regarding Plaintiff's retaliation claim were consistent with our holding above.

In *Furukawa*, this court held that compensatory and punitive damages are generally available in HRS § 378–2 employment discrimination cases as remedies from a court, the HCRC, or both. *See* 85 Hawaiʻi at 18–19, 936 P.2d at 654–55.

## X.

Defendants seek a new trial on the grounds (1) that Plaintiff and his counsel's comments regarding Defendants' failure to comply with the April 3, 1997 court order compelling discovery of scoreboard sheets and collector performance reports were prejudicial, (2) that the punitive damage award was not supported by the evidence, and (3) that the amount awarded was excessive.

## XI.

 As to the first ground, nothing in the record suggests that the jury based its award of punitive damages on the challenged comments. The purported prejudicial statements regarding the scoreboard sheets and collector performance reports were made during direct examination of Jonathan and of Marilyn Ramos, the treasurer of Reliable, and in Plaintiff's closing argument. The relevant direct examination of Jonathan was as follows:

Q. [PLAINTIFF'S COUNSEL] Do you recall Judge Virginia Crandall's April 3, 1997 Court Order requiring you to produce all the scoreboard sheets for the collect[or] performance reports ... ? Do you recall that?

A. [JONATHAN] I believe so, yes.

Q. And you recall this Court ordering the same items to be produced?

A. I believe so, yes.

Q. After being ordered at least two times by two different judges, why is it that only three collect[or] performance reports ... were produced?

. . . .

A. I believe that's all we had.

The pertinent direct examination of Ramos was as follows:

Q. [PLAINTIFF'S COUNSEL] Now, you were subpoenaed to bring scoreboard sheets; correct?

A. [RAMOS] Correct.

. . . .

Q. And so what happened to all the scoreboard sheets from 1987 to 1993 that you were subpoenaed to bring?

A. I don't know.

In his closing argument, Plaintiff's counsel asserted that Defendants "benefitted" from the absent reports.

Similarly, when I asked [Jonathan] about the collect[or] performance reports for the years that we wanted to go back to 1987, in

his deposition he said he had them back in his office,[35] they were kept in the same place, *and at trial when the [c]ourt ordered them to produce them, they magically disappear.* Why? I guess we'll have to ask [Jonathan] that. But if you think about it, who would benefit from having these collect[or] performance reports magically disappear? Well, it's not [Plaintiff], because [Plaintiff] wanted those reports so he could establish exactly the amount of commissions that were due.

*Would [D]efendants benefit from having these reports missing? Probably.* And the reason is those reports, at least for the J–2 desk, the J–7 and J–8 desk, it would probable [sic] show more than what [Plaintiff]'s estimating he took in on those desks. I mean, he's not going to benefit from having those documents missing. It's only the [D]efendants that would benefit from having them missing.

(Emphases added.)

■ Defendants' counsel did not object to the questions asked during the direct examination of Jonathan or to this part of Plaintiff's closing argument. Hawai'i Rules of Evidence (HRE) "Rule 103(a)(1), which covers the situation where evidence is admitted at trial, requires a specific objection or motion to strike if the ground is not apparent from the context, [and] a complete failure to object will waive the point." [36] *State v. Vliet,* 91 Hawai'i 288, 298–99, 983 P.2d 189, 199–200 (1999) (internal quotation marks and citations omitted). By failing to object in a timely manner, Defendants waived this point.

In any event, although HRE Rule 103(d) allows the court to "[take] notice of plain errors affecting substantial rights," we do not discern any such errors here. The questions asked of Jonathan and Ramos were necessary to explain the absence of financial records and, thus, Plaintiff's inability to testify to the exact amount of unpaid wages. In

Plaintiff's closing argument, the reference to Defendants' failure to provide the documents was made in the context of Plaintiff's wage claim, not his punitive damage claim.

Defendants correctly point out that the jury could only consider Defendants' state of mind at the time of the retaliatory act and not their subsequent actions, *i.e.,* the failure to provide documents, in determining the degree of malice, oppression, or gross negligence which forms the basis for the punitive damage award. *See Kunewa v. Joshua,* 83 Hawai'i 65, 73, 924 P.2d 559, 567 (App.1996).

### XII.

■ As to the second ground, there was evidence supporting the punitive damages award. Clear and convincing evidence of " 'some wilful misconduct or ... entire want of care which would raise presumption of a conscious indifference to consequences' " supports an award of punitive damages. *Ditto v. McCurdy,* 86 Hawai'i 84, 91, 947 P.2d 952, 959 (1997) (quoting *Masaki v. General Motors Corp.,* 71 Haw. 1, 11, 780 P.2d 566, 572, *reconsideration denied,* 71 Haw. 664, 833 P.2d 899 (1989)).

In his closing argument, Plaintiff mentioned the following events in evidence as the bases for his retaliation claim: (1) locking Plaintiff out of the office and not giving him a key; (2) failing to give him a Christmas bonus in 1992; (3) paying commissions and salary to Plaintiff's replacement on the J–2 desk after paying Plaintiff only a salary on that desk; (4) denying Plaintiff's workers' compensation claim; (5) over-reporting Plaintiff's 1993 income; and (6) terminating Plaintiff. We discern no error as to the first five argued grounds for punitive damages. We first discuss the termination claim separately, it being germane to Defendants' argument that Plaintiff's termination claim

---

**35.** At trial, Jonathan had stated that he "[did] not recall" whether he had the reports going back to 1987.

**36.** HRE Rule 103 (1993) provides, in pertinent part, as follows:

**Rulings on Evidence.** (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence un-

less a substantial right of the party is affected, and:

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context ...

amounted to fraud on the court, while Plaintiff maintains that termination was impliedly tried under HRCP Rule 15.

### A.

As to termination, Defendants urge that Plaintiff committed a fraud on the court because: (1) prior to trial, Plaintiff never testified that anyone had fired him; (2) their COBRA Qualifying Notice stated that Plaintiff's health insurance coverage was ending due to "termination of employment, due to quit, layoff, or any other reason"; and (3) Plaintiff admitted that he was "on industrial leave from his employment" up until the date of trial. The result of this alleged fraud, Defendants maintain, is that during the trial. their rebuttal was limited to adducing oral testimony denying termination occurred and that they were unable to proffer documentary evidence showing Plaintiff's subsequent return to work. As stated *supra*, Defendants raised this fraud-on-the-court argument for the first time when they filed their supplemental memorandum in support of their motion for new trial and/or to amend judgment pursuant to HRCP Rule 59(a) and (e) and requested the court, pursuant to HRCP Rule 60(b), to set aside the judgment based on fraud on the court.

In response to Defendants' fraud on the court argument, Plaintiff asserts that (1) despite Jonathan's assurance that Plaintiff would have his job after his workers' compensation leave, the COBRA Eligibility Notice stated he was terminated; (2) Jonathan testified that there was no job available for Plaintiff because he had never heard from Plaintiff regarding his return to work [37]; and (3) Defendants impliedly consented under HRCP Rule 15 to try the unpleaded issue of termination.

### 1.

Certain facts are common to both the fraud on the court and Rule 15 issues. In pretrial documents, Plaintiff did not allege that he was terminated from employment. Plaintiff's March 3, 1994 pretrial statement included a list of alleged acts of retaliation, but did not include termination as one of those acts.[38] Plaintiff's April 28, 1995 settlement conference statement stated that Plaintiff "[was] not employed at this time and [was] on industrial leave from his employment." His February 25, 1997 settlement conference statement stated the same thing.

At trial, Plaintiff's counsel indicated in his opening statement that Plaintiff was terminated in May 1993.[39] As to the retaliation claim itself, Plaintiff's opening statement only mentioned Defendants' changing of the locks. [Tr. 4/8/97 at 14–17.] Defendants' counsel, in his opening statement, maintained that "[Plaintiff] actually worked for both [Reliable and Pacific] when he left active employment

---

37. The following examination took place.

Q. [PLAINTIFF'S COUNSEL] Correct me if I'm wrong, now. I believe your testimony was [Plaintiff]'s job essentially is still open for him. Is that what you're saying?

A. [JONATHAN] I didn't say—I just never heard back from him. He just never came back, never heard if he was going to come back.

Q. Okay. I think in response to [Defense Counsel]'s question, he asked you what does the books of Reliable show. And I believe you stated it was open.

A. I don't believe I received any letter that he was leaving or that he had quit.

Q. So as far as the books of Pacific and Reliable, though, it's considered open, his position; is that right?

A. I don't know if that's the correct term. But we just never heard back from him.

Q. Is his position still open?

A. I don't believe so at this point because the desks were already filled.

Q. I believe your testimony was he was never terminated.

A. I never terminated him, no.

Q. Maybe somebody else terminated him?

A. Not that I'm aware.

38. The list included the lock change, the Christmas bonus, and Fred's alleged statement that Plaintiff was "stabbing him in the back" with his civil rights complaint.

39. In opening statement, Plaintiff's counsel stated as follows:

The claim [Plaintiff] is making is not only for 1991 but the wages and salaries for the years 1988, 1990, 1991, and 1992 and up to February of 1993[w]hen [Plaintiff] left his work because of a work comp injury. He was injured at work and could not work until June of 1995, he was able to go back to work. But by that time, in June of 1995, he was already terminated. He was terminated back in May of 1993.

on a worker[s'] compensation claim." [*Id.* at 22.]

As to the COBRA Qualifying Notice, Jonathan testified that Plaintiff was not terminated and Plaintiff returned to work after its issuance:

Q. [DEFENDANTS' COUNSEL] What was the purpose of this sending out this [COBRA] notice?

. . . .

A. [JONATHAN] It was to inform the insurance [sic] that [Plaintiff] was no longer coming into work and that I believe by the law you have to fill out this [COBRA] form and submit it to the proper people with the health plan.

Q. Was that the only reason that this form was sent out?

A. Correct.

Q. *Was [Plaintiff] terminated from his job?*

A. *No.*

Q. Was he able to return to work after his worker[s'] compensation injury was resolved?

A. I was informed he was [by the workers' compensation board, Plaintiff's attorney, and the law firm representing Reliable and Pacific at the time].

. . . .

Q. *So did [Plaintiff] come back to work after that worker's comp injury?*

A. *Yes, he did.*

(Emphases added.) On redirect examination of Jonathan by Plaintiff's counsel, Jonathan reiterated that the notice referred to "any other reasons."

During Plaintiff's direct examination by his counsel, Plaintiff identified the COBRA Eligibility Notice as "a form that [he] received from the medical health plan . . . notifying [him] that [his] group health insurance was terminated as of [May 31, 1993] due to the fact that [his] employment had been terminated on [May 12, 1993]." Defendants' counsel did not object to admission of the COBRA Eligibility Notice into evidence. At that point, Plaintiff mentioned that he considered the document a notification of termination and a retaliatory act:

Q. [PLAINTIFF'S COUNSEL] And when you received this notice, were you still out on worker[s'] compensation injury?

A. [PLAINTIFF] Yes. I was still fighting with the company, the insurance company, trying to prove that it was a justifiable workmens comp claim.

. . . .

Q. Was this the first time you were notified of your termination?

A. *The only time.*

Q. *Did you consider this to be retaliation?*

A. *Absolutely.*

Q. Anything else you consider to be retaliation?

A. Well, I consider retaliation when I went out on workmens compensation on February the 13th, my doctor told me . . . that I had carpal tunnel and it required surgery. So I went into the office, and I told both [Leder] and [Jonathan] that I had to go out on workmens comp. My doctor told me that I would require surgery and three weeks recovery at which time I could come back to work. And I told him that, and he said, "Don't worry, [Plaintiff], I'll keep your desk open for you."

(Emphases added.) Plaintiff recounted that no one representing Defendants contacted him regarding returning to work after he was "terminated on May 12, 1993" and that he was claiming damages for the termination as well. During cross-examination, Defendants' counsel did not touch on the termination issue.

When moving for a directed verdict on the retaliation claim, Plaintiff's counsel maintained that "liability on the retaliation claim can also be established because [Plaintiff] was told his job position would be kept open by [Jonathan] . . . when he went on industrial leave [and] in May 1993[ ] he was terminated." Defendants made a general objection to Plaintiff's motion for directed verdict on all claims, arguing, "[W]e think taking the evidence in the light most favorable to the non-moving party, that all the remaining issues in the case aren't contested and should be sub-

mitted to the jury." The court denied Plaintiff's motion.

After describing other alleged events of retaliation, Plaintiff's counsel stated in closing argument as follows:

> Then *I guess the killing blow was his termination on March [sic] 12, 1993.* The termination letter clearly states you're terminated May 12, 1993. And this is after [Jonathan] told [Plaintiff] when he was going off on his [w]ork [c]omp leave, that I'll keep your job open. And this is in February of 1993, [Jonathan] said don't worry, I'll keep your job open, and [Jonathan] terminates him in May of 1993.

(Emphasis added.) Defendants did not object to this statement. In their closing argument, Defendants' counsel stated that

> [Plaintiff] got a letter from the insurance company that provides health insurance to the employees of [Pacific] and Reliable in 1993 indicating that under the COBRA laws, he had the right to assume his health insurance coverage and pay the premiums himself. *Because he was out on workers['] compensation leave, this was a standard procedure. But he's interpreting that and trying to suggest that he was terminated. That's not the case.*
>
> He was never terminated from [Pacific] and Reliable. He went out on [w]orker's [c]ompensation leave, and after being out for approximately two years and three months, he came back to work. [Jonathan] said he showed up one day with his arm in a sling, and then left shortly thereafter. There's nothing in writing from the companies, either Pacific or Reliable, terminating [Plaintiff].
>
> The letter from the insurance company, I suggest, ladies and gentlemen, should not be interpreted as a notice of termination, but put into it's proper context, simply that it's [sic] health insurance, it's no longer going to be paid for by the company, but he can now pick it up on his own if he wants to. [Plaintiff] takes bits and pieces of information and leaps to a conclusion.

(Emphasis added.)

### 2.

As noted earlier, the court concluded that there was no fraud on the court and denied Defendants' HRCP Rule 60(b)[40] motion for a new trial on this ground.[41]

> It is well settled that the trial court has a very large measure of discretion in passing upon motions under [HRCP] Rule 60(b) and its order will not be set aside unless we are persuaded that under the circumstances of the particular case, the court's refusal to set aside its order was an abuse of discretion.

*Hawai'i Hous. Auth. v. Uyehara,* 77 Hawai'i 144, 147–48, 883 P.2d 65, 68–69 (1994) (internal quotation marks and citations omitted).

This court has defined "fraud on the court" as " 'a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.' " *Kawamata Farms, Inc. v. United Agri Prods.,* 86 Hawai'i 214, 256, 948 P.2d 1055, 1097 (1997) (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), *overruled on other grounds by Standard Oil Co. of California v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976)). Specific instances of fraud on the court have been recognized in this jurisdiction. *See, e.g., id.* at 255–59, 948 P.2d at 1096–1100 (intentionally withholding material evidence from plaintiffs); *Farrow v. Dynasty Metal Sys., Inc.,* 89 Hawai'i 310, 314, 972 P.2d 725, 729 (App. 1999) (deceiving the court as to a litigant's identity); *Southwest Slopes, Inc. v. Lum,* 81 Hawai'i 501, 509, 918 P.2d 1157, 1165 (App. 1996) (possible fraud on the court by party claiming lack of knowledge of an archeological site on a parcel of land). *Southwest* involved purported perjury, but the case did not involve an analysis under HRCP Rule 60(b).

---

**40.** *See supra* note 16.

**41.** Defendants' motion for new trial on grounds other than fraud on the court was based on HRCP Rule 59(a) and (e). *See supra* note 15.

In as much as Federal Rules of Civil Procedure (FRCP) Rule 60(b) and HRCP Rule 60(b) are almost identically worded, interpretations of FRCP Rule 60(b) are helpful in this case. *See Gold v. Harrison,* 88 Hawai'i 94, 105, 962 P.2d 353, 364 (1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1254, 143 L.Ed.2d 351 (1999) ("Where we have patterned a rule of procedure after an equivalent rule within the FRCP, interpretations of the rule by the federal courts are deemed to be highly persuasive in the reasoning of this court.") (internal quotation marks and citations omitted).

▉▉▉▉▉ Not any fraud connected with the presentation of a case amounts to fraud on the court. *See* 11 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2870, at 416 (1995). It must be a "direct assault on the integrity of the judicial process." *Id.* Courts have required more than nondisclosure by a party or the party's attorney to find fraud on the court. *See id.* at 416–17 (footnotes omitted). Examples of such fraud include "bribery of a judge," *id.* at 418 (footnote omitted), and "the employment of counsel in order to bring an improper influence on the court." *Id.* at 418–19 (footnote omitted). "[F]raud on the court under Rule 60(b) must be established by clear and convincing evidence[.]" *Madonna v. United States,* 878 F.2d 62, 65 (2d Cir.1989) (citations omitted). If thus established, the court

may vacate the judgment and deny the offending party all relief.[42] *See* 11 Wright & Miller, *supra,* at 413 (footnote omitted).

▉▉▉ In this case, Defendants assert that they did not terminate Plaintiff's employment and that, by representing to the court and the jury that they did, Plaintiff committed fraud. According to Defendants, the COBRA notices were properly issued under Hawai'i and federal laws. As Defendants point out, HRS § 393–11 (1993) requires health care coverage of regular employees by a group prepaid health care plan.[43] If an employee is hospitalized or otherwise prevented by sickness from working and earning wages, HRS § 393–15 (1993) mandates continued health care coverage for a period not exceeding three months following the month in which the employee became unable to work and earn wages.[44] An employee who loses health care coverage has the right to elect continued coverage if coverage was lost as a result of a qualifying event. *See supra* note 10. The list of events on the COBRA Qualifying Notice that Pacific sent to the insurance carrier is almost identical to that set forth in 29 U.S.C. § 1163.[45]

The COBRA Qualifying Notice stated that Plaintiff's health insurance coverage was ending due to "termination of employment, due to quit, layoff, or any other reason." The COBRA Eligibility Notice listed termi-

**42.** A court's power to vacate a judgment for fraud on the court is great, and has few procedural limitations. *See* 11 Wright & Miller, *supra,* at 413. For example, courts place no time limit on setting aside a judgment on this ground, *see id.* at 412 (footnote omitted), and it is irrelevant whether a party claiming the other party's fraud has clean hands. *See id.* (footnote omitted). Since the remedy for fraud on the court is far reaching, *see id.* at 413–14, it only applies to very unusual cases involving "far more than an injury to a single litigant[,]" *id.* at 415, but rather, a "corruption of the judicial process itself." *Id.* at 418.

**43.** HRS § 393–11 provides as follows:

**Coverage of regular employees by group prepaid health care plan.** Every employer who pays to a regular employee monthly wages in an amount of at least 86.67 times the minimum hourly wage, specified in chapter 387, as rounded off by regulation of the director, shall provide coverage of such employee by a prepaid group health care plan qualifying under

section 393–7 with a prepaid health care plan contractor in accordance with the provisions of this chapter.

**44.** HRS § 393–15 provides as follows:

**Continuation of coverage in case of inability to earn wages.** If an employee is hospitalized or otherwise prevented by sickness from working, the employer shall enable the employee to continue the employee's coverage by contributing to the premium the amounts paid by the employer toward such premium prior to the employee's sickness for the period that such employee is hospitalized or prevented by sickness from working. This obligation shall not exceed a period of three months following the month during which the employee became hospitalized or disabled from working, or the period for which the employer has undertaken the payment of the employee's regular wages in such case, whichever is longer.

**45.** *See supra* note 10.

nation of employment as the sole ground for its issuance. Although both notices listed a termination date of May 12, 1993, Plaintiff did return to work on April 4, 1994, without objections from Defendants. Prior to the trial, Plaintiff did not allege that he was terminated. Based on this record, the questions whether Plaintiff was in fact terminated and, if so, whether the termination was intended as a retaliatory act are arguable. "[A]n appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence," *Brooks*, 90 Hawai'i at 376 n. 5, 978 P.2d at 814 n. 5, and, thus, we do not believe that there was clear and convincing evidence that Plaintiff committed fraud on the court.

### 3.

#### a.

■■■ Relying on HRCP Rule 15(b), Plaintiff argues that Defendants impliedly consented to try the issue of termination by failing to object to related statements and evidence. Defendants appear to contend that they did not consent either expressly or impliedly to try the termination issue as a retaliatory act, citing *Cresencia v. Kim*, 10 Haw.App. 461, 878 P.2d 725 (1994).

---

**46.** The complaint states in pertinent part as follows:

I. *FACTUAL ALLEGATIONS*

. . . .

14. Plaintiff filed a complaint against Defendants Reliable and Pacific with the Hawaii Civil Rights Commission on October 23, 1992 and received a right to sue letter dated December 2, 1992 with a copy also sent to Defendants Reliable, Pacific, and John Kirschner.

15. On or about December 4, 1992, Defendant John Kirschner, his agent, employee or someone under his control changed the locks to the outer doors to the offices located at 33 South King Street, Suite 505, Honolulu, Hawaii 96813 and new keys were not issued to Plaintiff.

16. On or about December 15, 1992, everyone was given a Christmas bonus except Plaintiff.

17. On or about December 17, 1992, Defendant Fred Kirschner stated, "I told Jon not to give you a bonus because you are stabbing me in the back with this complaint."

18. The actions taken against Plaintiff from December 4, 1992 forward are retaliatory actions for filing the civil rights complaint.

#### b.

Whether or not HRCP Rule 15(b) is implicated here depends on whether or not Plaintiff was required expressly to plead the termination issue in his complaint.

The complaint alleged the lock change, the Christmas bonus, and Fred's alleged statement, but not termination, as grounds for retaliation.[46] Because, according to the COBRA notices, the alleged termination occurred on May 12, 1993, which is after Plaintiff filed his complaint on February 26, 1993, the termination issue could not have been originally pled in the complaint. However, Plaintiff could have amended his complaint to include the termination issue. *See* HRCP Rule 15(a) (stating that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires"). Thus, the question whether termination should have been included in Plaintiff's complaint remains.

#### c.

We agree with Plaintiff that although the termination issue was not pleaded, the issue was tried with the parties' implied consent.[47] HRCP Rule 15(b) provides:

19. Plaintiff filed a complaint for unlawful retaliation against Defendants Reliable, Pacific, Jonath[a]n Kirschner and Fred Kirschner on February 12, 1993 and was given a right to sue letter by the Hawaii Civil Rights Commission on February 18, 1993.

II. *CLAIMS FOR RELIEF*

. . . .

*COUNT FOUR*

26. Plaintiff realleges and incorporates paragraphs 1–19 herein.

27. By retaliating against Plaintiff for filing a complaint with the Hawaii Civil Rights Commission, Defendants have violated H.R.S. Sections 378–2(2) and (3).

. . . .

**47.** The complaint did not allege the following three other grounds for Plaintiff's retaliation claim: paying commissions and salary to Plaintiff's replacement on the J–2 desk after paying Plaintiff only a salary on that desk; denying Plaintiff's workers' compensation claim; and over-reporting Plaintiff's 1993 income. However, the parties do not raise the pleading issue as to those grounds. Thus, we consider only the termination question here.

**Amended and Supplemental Pleadings.**

(b) Amendments to Conform to the Evidence. *When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.* Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him [or her] in maintaining his [or her] action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.[48]

(Emphasis added.)

 "The purpose of Rule 15(b) is to allow an amendment of the pleadings to 'bring the pleadings in line with the actual issues upon which the case was tried[,]'" *Cresencia*, 10 Haw.App. at 477, 878 P.2d at 734 (quoting 3 J. Moore and R. Freer, *Moore's Federal Practice* ¶ 15.13[2], at 15–130 (2d ed.1994)), and to "'promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel or on the basis of a statement of the claim or defense that was made at a preliminary point in the action and later proves to be erroneous.'" *Id.* at 477–78, 878 P.2d at 734 (quoting 6A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1491, at 5–6 (1990) (footnote omitted)). "'Rule 15(b) is not permissive in terms: it provides that issues tried by express or implied consent shall be treated as if raised in pleadings.'" *Hamm v. Merrick*, 61

Haw. 470, 474, 605 P.2d 499, 502 (1980) (quoting 3 *Moore's Federal Practice*, at 177).

In this case, Defendants did not expressly consent to try the unpleaded issue of termination. *See Cresencia*, 10 Haw.App. at 478, 878 P.2d at 734 ("Express consent may be found in a stipulation, or may be incorporated in a pretrial order.") (citing 6A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1493, at 18–19 (1990); 3 *Moore's Federal Practice* ¶ 15.13[2], at 15–132). As to implied consent, Plaintiff cites *Hamm*. In *Hamm*, a plaintiff brought a slander suit, alleging that a defendant told various persons that the plaintiff wrongfully took money from the plaintiff's company. *See id.*, 61 Haw. at 470, 605 P.2d at 500. In his answer, the defendant flatly denied making the statements and did not raise the defense of qualified privilege. *See id.* Later, the defendant moved for a directed verdict and/or dismissal based on the defense of qualified privilege. *See id.* at 471, 605 P.2d at 500. The trial court denied the motion on the ground that the defense had not been pleaded. *See id.* The defendant then moved to amend his answer to include the qualified privilege defense under HRCP Rule 15(b). The trial court denied the motion, stating that there was no implied consent to try the defense. *See id.*

On appeal, this court stated that, "[i]n this jurisdiction, consent will be implied from the failure to object to the introduction of evidence relevant to the unpleaded issue." *Id.* at 473, 605 P.2d at 502. Based on this rule, the court held that implied consent existed because "there was no objection to the introduction of evidence relevant to the unpleaded defense of qualified privilege," and, "[i]n fact, [the plaintiff] himself introduced such evidence as part of his case." *Id.* at 473, 605 P.2d at 501–02.

In this case, Defendants introduced the COBRA Qualifying Notice, apparently to show when Plaintiff was on workers' compensation leave. Jonathan testified that the purpose of the notice was to inform the health insurance company that Plaintiff "was

---

**48.** HRCP Rule 15 was amended on December 7, 1999, which became effective on January 1, 2000. The language of subsection (b) was not amended except for gender neutral revisions, i.e., "his" became "the party's."

no longer coming into work[.]" When asked whether Plaintiff was terminated from his work, Jonathan said, "[N]o," and testified that Plaintiff returned to work after he had received this notice. When Plaintiff's counsel asked Jonathan whether "[Plaintiff's] employment, for whatever reason, [wa]s terminated" based on the COBRA Qualifying Notice, Jonathan testified that he never terminated Plaintiff and explained that the COBRA Qualifying Notice was sent because "[Plaintiff] never came back" and Defendants "never heard if he was going to come back."

Based on the foregoing testimony, we cannot conclude that Defendants "had no notice that they were required to defend against [the retaliation claim] based upon [the alleged termination]." *Cresencia*, 10 Haw. App. at 479, 878 P.2d at 735. Instead, the testimony suggests that Defendants understood that this evidence could be used as a proof of termination and defended themselves on that issue. *See In re Acequia, Inc.*, 34 F.3d 800, 814 (9th Cir.1994).

Introducing the COBRA Eligibility Notice, Plaintiff testified that he considered the notice to be a notice of termination and a retaliatory act. Plaintiff explained that he was "claiming damages for the termination as well." Defendants' counsel did not object to the introduction of the COBRA Eligibility Notice or address the termination issue during his cross-examination of Plaintiff. While the COBRA Qualifying Notice, introduced by Defendants, was relevant to the workers' compensation issue, Plaintiff's introduction of the COBRA Eligibility Notice, along with his testimony, should have "serve[d] to give [Defendants] fair notice that [the] new issue [of employment termination as a retaliatory act was] entering the case." *Wesco Mfg. Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487 (11th Cir.1987) (internal quotation marks and citations omitted). It is apparent that Plaintiff introduced the COBRA Qualifying Notice to demonstrate that Defendants terminated his employment as retaliation. Defendants' "consent will be implied from [their] failure to object to the introduction of [the COBRA Eligibility Notice, which is] relevant to the unpleaded issue

[of termination]." *Hamm*, 61 Haw. at 473, 605 P.2d at 502 (internal quotation marks and citation omitted).

Plaintiff's counsel, moving for a directed verdict on the retaliation claim, stated that the claim could be established, *inter alia*, by the fact that plaintiff was terminated. Defendants made a general objection to the motion, but did not specifically address the termination issue. Plaintiff's motion again should have served as notice that Defendants were required to defend against the termination issue. *See Cresencia*, 10 Haw.App. at 479, 878 P.2d at 735.

In closing arguments, Plaintiff's counsel contended that "the killing blow" of Defendants' retaliation against Plaintiff was his termination, and Defendants' counsel vigorously argued that there was no termination. Thus, the record as recounted seems to reflect "considerable litigation" of termination as a retaliatory act. *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 831 (6th Cir.2000).

The documents attached to Defendants' motion for a new trial suggest that their introduction during trial could have supported Defendants' position that Plaintiff was not terminated. It is not evident why they failed to introduce the documents. In the course of a case such as this one, the events occurring between issuance of the COBRA notices and Plaintiff's return to work in April 1994 would be vigorously litigated. However, Defendants' failure to introduce the documents earlier does not alter the facts that: (1) Defendants "fail[ed] to object to the introduction of evidence relevant to the unpleaded issue [of termination]," *Hamm*, 61 Haw. at 473, 605 P.2d at 501; (2) Defendants had "notice that they were required to defend against [the termination issue]," *Cresencia*, 10 Haw.App. at 479, 878 P.2d at 735; and (3) Defendants "understood the evidence to be aimed at the unpleaded issue [of termination]" and the parties "considerabl[y] litigat[ed] ... [the] matter[.]" *Kovacevich*, 224 F.3d at 831 (internal quotation marks, brackets, and citations omitted).

Consequently, we must conclude that the termination issue was tried by the parties' implied consent.

### B.

In addition to their fraud-on-the-court argument regarding termination, Defendants contend that the other five bases for Plaintiff's retaliation claim are not supported by evidence. They argue that they replaced the locks in December 1992 because their office was burglarized in November 1992, the police advised them to do so, and only Jonathan and Leder received new keys. On the other hand, Plaintiff contends that since Defendants did not report the incident to the police until July 1993, the police could not have advised Defendants to change the locks prior to December 1992. According to Plaintiff, retaliation was the only reasonable explanation for Defendants' act.

Defendants argue that the lack of a Christmas bonus was not retaliatory because Christmas bonuses were discretionary, and that Plaintiff was not the only one who did not receive a bonus in 1992.[49] On the other hand, Plaintiff argues that the jury could have found this circumstance retaliatory because (1) Fred, who was not normally involved in day-to-day management, told Jonathan not to give Plaintiff a bonus because Plaintiff was "stabbing him in the back with the complaint"[50]; (2) Plaintiff received a bonus every year prior to 1992; and (3) Leder testified that Plaintiff was one of the two best collectors he knew in Leder's thirty years in the business.

Defendants maintain that no retaliatory action can be discerned from the fact that, as opposed to Plaintiff, Loando received a $1,800 per month salary plus commissions on the J–2 desk. They point out that Plaintiff was a supervisor while Loando was strictly a collector and thus subject to different pay structures. Defendants also explain that the salary reduction was not directed at Plaintiff alone because Jonathan reduced Leder's salary by $7,000 that year. Plaintiff did not respond to this issue in his answering brief.

Defendants assert that the initial denial of Plaintiff's workers' compensation claim was not a retaliatory act because the denial came from the insurer[51] and the decision was reversed prior to the hearing scheduled for Plaintiff's challenge of the denial. Defendants declare that the insurance carrier and not they was responsible for informing Plaintiff of the reversal of the denial. Plaintiff does not discuss this issue in his answering brief.

Defendants urge that their over-reporting of Plaintiff's 1993 income[52] could not be a basis for the punitive damage award and disagree with Plaintiff's contention that "[t]hat got [Plaintiff] in a lot of trouble with the IRS." Defendants relate that all Plaintiff had to do as a result of the over-reported W–2 form was to file "a routine complaint for new W–2s" with the IRS and a criminal complaint against Defendants with the IRS criminal fraud department. Defendants also point out that according to Plaintiff's testimony, he did not know the disposition of those complaints.

As to the foregoing five matters and termination, the evidence was disputed at trial and the weight to be given the evidence was for the trier of fact to determine. *See LeMay v. Leander*, 92 Hawai'i 614, 626, 994 P.2d 546, 558 (2000) (stating that "it is within the province of the trier of fact to weigh the evidence and to assess the credibility of the witnesses, and this court will refrain from interfering in those determinations") (citing *State v. Eastman*, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996)). The jury could have concluded from what was presented that there was clear and convincing evidence of " 'some wilful misconduct or . . . entire want of care which would raise presumption of a conscious indifference to consequences[.]' " *Ditto*, 86 Hawai'i at 91,

---

**49.** Four to five other employees, including Jonathan and Leder, did not receive a bonus.

**50.** Fred denied making this statement.

**51.** The letter from the insurer states that "[y]our employer has denied liability of this alleged injury."

**52.** Defendants argue that the "seeming" discrepancy resulted from the accounting process dealing with his extended sick leave. Tiara Rierson, an administrative supervisor of Reliable and Pacific in charge of employees' payroll, hours, and sick leave, testified that Defendant was shown on the company records as out on sick leave and his sick pay did not end until his workers' compensation status was definitely determined.

**436**

947 P.2d at 959 (quoting *Masaki*, 71 Haw. at 11, 780 P.2d at 572). *See also Brooks*, 90 Hawai'i at 376, 978 P.2d at 814 ("[A]n appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence.").

## XIII.

As to the last ground, Defendants contend that the punitive damage award was excessive.

In reviewing a jury's award of damages when a claim of excessiveness is pressed upon us for decision, we are bound by the general rule that

> a finding of an amount of damages is so much within the exclusive province of the jury that it will not be disturbed on appellate review unless palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of the case as to demonstrate that the jury in assessing damages acted against rules of law or suffered their passions or prejudices to mislead them.

*Vasconcellos v. Juarez*, 37 Haw. 364, 366 (1946); *see also Brown v. Clark Equipment Co.*, 62 Haw. 530, 536, 618 P.2d 267, 271–72 (1980); *Kang v. Harrington*, 59 Haw. 652, 663, 587 P.2d 285, 292 (1978); *Orso v. City & County*, 56 Haw. 241, 249, 534 P.2d 489, 494 (1975); *Nakagawa v. Apana*, 52 Haw. 379, 389–90, 477 P.2d 611, 617 (1970); *Johnson v. Sartain*, 46 Haw. 112, 114, 375 P.2d 229, 230–31 (1962).

*Quedding v. Arisumi Bros., Inc.*, 66 Haw. 335, 339, 661 P.2d 706, 709–710 (1983). In this case, we cannot conclude that the award was "palpably not supported by the evidence." *Id.* (internal quotation marks and citations omitted); *see also* discussion *supra* part X.B. Furthermore, nothing in the record indicates that the award was "so excessive and outrageous when considered with the circumstances of the case as to demonstrate that the jury in assessing damages acted

against rules of law or suffered their passions or prejudices to mislead them." *Quedding*, 66 Haw. at 339, 661 P.2d at 709 (internal quotation marks and citations omitted). We thus conclude the award was not excessive. Accordingly, the court did not abuse its discretion in denying Defendants' motion for a new trial on the foregoing grounds, and we affirm the punitive damage award.[53]

## XIV.

Plaintiff contends that the jury erred in awarding Pacific $4,536 when Plaintiff received interest-free loans totaling $4,200. It is unclear from the verdict itself why the jury awarded the additional $336 to Pacific. Defendants did ask for judgment against Plaintiff for "the principal loan amount of $4,200.00 plus pre-judgment and post-judgment interest thereon until fully paid." Defendants speculate that the additional amount was, like the additional award on unpaid wages, 8% of the principal amount awarded. Nevertheless, the undisputed evidence was that Pacific did not charge any interest on the loans and that there was no fixed repayment term. Thus, the jury erred in awarding more than $4,200. We vacate that part of the award which exceeds $4,200, *i.e.*, $336.[54]

## XV.

The court granted Defendants' motion for directed verdicts on the compensation discrimination claim and on the individual liability claims against Jonathan and Fred. Plaintiff cross-appeals the granting of the motion. "Reviewing the grant of a directed verdict, we apply the same standard as the trial court." *Furukawa*, 85 Hawai'i at 11, 936 P.2d at 647 (citing *Weinberg v. Mauch*, 78 Hawai'i 40, 50, 890 P.2d 277, 287, *reconsideration denied*, 78 Hawai'i 421, 895 P.2d 172 (1995)).

> [A] directed verdict may be granted only when after disregarding conflicting evidence, giving to the [non-moving party's]

53. *See supra* note 33.

54. Of course, following the judgment, Defendants would be entitled to post judgment interest on this amount. *See* HRS § 478–3 (1993) ("In-

terest at the rate of ten per cent a year, and no more, shall be allowed on any judgment recovered before any court in the State, in any civil suit.").

evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in [the non-moving party's] favor, it can be said that there is no evidence to support a jury verdict in his [or her] favor. *Id.* at 11–12, 936 P.2d at 647–48 (internal quotation marks and citation omitted).

## A.

■ Plaintiff argues that the directed verdict on the claim of compensation discrimination based on age must be vacated because the evidence demonstrated that younger employees who worked on the same desks as Plaintiff received salaries and commissions specific to those desks and he did not. Defendants maintain that Plaintiff received a salary and commissions for what he did and that because he was a supervisor he was not similarly situated to the said employees.

At trial, Plaintiff testified that he did not receive commissions or salaries on the J–2, J–7, J–8, K–31, and K–33 desks and received only part of the salaries and commissions on the K–30 and J–40 desks. Loando recounted that he started work on the J–2 desk in July 1993 at the age of twenty-seven and that he received a monthly salary in addition to commissions. Miyasaki, who was born on September 5, 1923, was older than Plaintiff. She reported that at some point, she started to work on the J–7 and J–8 desks. She received a monthly salary and commissions.

Plaintiff related that Mary Kamaka, twenty-seven years old at the time, worked on the K–31 desk from 1989 to 1991, and was paid a salary plus commissions, and that Tammy Wright, thirty-four or thirty-five years old at the time she was hired, started to work on the same desk in 1991 and received a salary and commissions. According to Plaintiff, Steve Stoddard, thirty-four years old at the time, started to work the K–30 desk in 1991 and received a salary and commissions.

As to his status as a supervisor, Plaintiff explained that in 1987, Leder attempted to form a management team that included Plaintiff. However, Plaintiff related that the team did not endure because Jonathan wanted to manage the company himself. When Plaintiff was asked if the younger employees, who were regular collectors, and Plaintiff, who was a legal accounts supervisor, were in different categories, Plaintiff stated, "That's not true. I'm a supervisor, a legal accounts supervisor who's making $700 a month for Reliable agency? ... You're saying that because I was a legal accounts supervisor, that I was entitled to earn less pay than everybody else from supervising?"

Plaintiff's compensation discrimination claim was based on the following facts: (1) persons younger than Plaintiff received salaries and commissions on the desks he had worked and (2) Plaintiff did not receive a salary and commissions specific to those desks when he covered them. The court granted the directed verdict in Defendants' favor on the ground that there was no evidence of disparate treatment.

## B.

Plaintiff's compensation discrimination claim is based on HRS § 378–2(1)(A). HRS § 378–2(1)(A) provides in pertinent part as follows:

**Discriminatory practices made unlawful; offenses defined.** It shall be an unlawful discriminatory practice:

(1) Because of race, sex, sexual orientation, *age,* religion, color, ancestry, disability, marital status, or arrest and court record:

(A) For any employer to refuse to hire or employ or to bar or discharge from employment, *or otherwise to discriminate against any individual in compensation* or in the terms, conditions, or privileges of employment[.]

(Emphasis added.) Construing HRS § 378–2(1)(A), this court in *Shoppe* laid out a prima facie test for age discrimination involving hiring and discharge.[55] Certain common

55. *Shoppe* is the most recent Hawai'i case interpreting HRS § 378–2. In *Shoppe,* this court held that

the plaintiff must establish a prima facie case of discrimination by demonstrating, by a preponderance of evidence, the following four ele-

precepts identified in *Shoppe* with respect to an age discrimination claim apply here.

Because Plaintiff argues that Defendants intentionally discriminated against him on the basis of age, his claim may be characterized as "individual 'disparate treatment' discrimination[,]" that is, "intentional discrimination against an individual who belongs to a protected class." [56] *Shoppe*, 94 Hawai'i at 377–78, 14 P.3d at 1058–59. Plaintiff does not "show by direct evidence that discriminatory factors motivated [his alleged compensation discrimination]." *Id.* at 378, 14 P.3d at 1059 (citing *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1187 (2d Cir.1992); *Caban–Wheeler v. Elsea*, 71 F.3d 837, 842–43 (11th Cir.1996) (parenthetical explanations omitted)). Hence, he must adduce circumstantial evidence of discrimination by applying the so-called *McDonnell Douglas* burden-shifting analysis. *See Shoppe*, 94 Hawai'i at 381–82, 14 P.3d at 1062–63 (applying the *McDonnell Douglas* framework to an age discrimination claim brought under HRS § 378–2).

"The *McDonnell Douglas* framework involves three steps." *Id.* at 378, 14 P.3d at 1059. First, a plaintiff must establish a prima facie case of discrimination. *See id.* If the plaintiff establishes the prima facie case, an intermediate burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 378–79, 14 P.3d at 1059–60. If the defendant rebuts the prima facie case, the burden reverts to the plaintiff to present evidence demonstrating that the defendant's articulated reasons were pretextual. *See id.* at 379, 14 P.3d at 1060 (citations omitted).

While *Shoppe* was concerned with age discrimination in hiring and discharge, such discrimination as it applies to compensation has

ments: (1) that [the] plaintiff is a member of a protected class; (2) that [the] plaintiff is qualified for the position for which [the] plaintiff has applied or from which [the] plaintiff has been discharged; (3) that [the] plaintiff has suffered some adverse employment action, such as a discharge; and (4) that the position still exists.
94 Hawai'i at 378, 14 P.3d at 1059 (citations omitted).

**56.** Two other theories of discrimination include " 'pattern-or-practice' discrimination," which is

not been discussed.[57] "In interpreting HRS § 378–2, . . . we [may look] to interpretations of analogous federal laws by the federal courts for guidance." *Id.* at 377, 14 P.3d at 1058 (citing *Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649 and *Sam Teague*, 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10 (citation omitted) (parenthetical explanations omitted)). "[H]owever, . . . federal employment discrimination authority is not necessarily persuasive, particularly where a state's statutory provision differs in relevant detail." *Id.* (citing *Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649 (citation omitted)).

The analogous federal law on age discrimination, the Age Discrimination in Employment Act of 1967 (the ADEA), 29 U.S.C.A. § 623 *et seq.*, provides in pertinent part as follows:

Prohibition of age discrimination

(a) Employer practices

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual *or otherwise discriminate against any individual with respect to his [or her] compensation,* terms, conditions, or privileges of employment, because of such individual's age[.]

29 U.S.C.A. § 623 (emphasis added). The text of the ADEA is similar to HRS § 378–2(1)(A) and does not "[differ] in relevant detail." *Shoppe*, 94 Hawai'i at 377, 14 P.3d at 1058. Thus, we may take into account federal case law interpreting the ADEA in evaluating discrimination claims with respect to compensation under HRS § 378–2(1)(A). *See id.*

"intentional discrimination against a protected class to which the plaintiff belongs[,]" and " 'disparate impact' discrimination," which is "unintentional discrimination based on a neutral employment policy that has a disparate impact on a protected class to which the plaintiff belongs." *Shoppe*, 94 Hawai'i at 377, 14 P.3d at 1058.

**57.** There is no Hawai'i compensation discrimination case law under HRS § 378–2 based on factors other than age.

We may also again consider case law arising from Title VII.[58] It is pertinent because "[the] interpretation of Title VII ... applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII.' " *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (quoting *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)) (footnote omitted). *See also Shoppe*, 94 Hawai'i at 379–81, 14 P.3d at 1060–62 (discussing Title VII cases to analyze an age discrimination claim).

In some federal courts, a plaintiff claiming compensation discrimination under the ADEA or Title VII must show that the plaintiff is a member of a protected class and similarly situated to higher paid employees.[59]

With regard to the "similar situation" requirement, this court held that a plaintiff "must prove that all of the relevant aspects of his [or her] employment situation were similar to those employees with whom he [or she] seeks to compare his [or her] treatment." *Furukawa*, 85 Hawai'i at 14, 936 P.2d at 650.

▉▉▉▉ In contrast to the "similar situation" standard, other federal courts have held that a plaintiff claiming compensation discrimination under the ADEA or Title VII must establish (1) that the plaintiff is a member of a protected class and (2) that the plaintiff was performing work "substantially equal" to that of non-protected members who were compensated at higher rates than the plaintiff.[60] The "substantial equality of jobs"

**58.** Title VII, in pertinent part, provides as follows:

§ 2000e–2. Unlawful employment practices
(a) Employer practices
It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate against any individual with respect to his [or her] compensation*, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his [or her] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his [or her] status as an employee, because of such individual's race, color, religion, sex, or national origin.
(Emphasis added.)

**59.** *See Watson v. Eastman Kodak Co.*, 235 F.3d 851, 857 (3d Cir.2000) (affirming summary judgment for the defendant on the wage discrimination claim based on race because the plaintiff "failed to identify any evidence that he was compensated at a lower rate than similarly situated employees"); *Amro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir.2000) ("A person alleging a Title VII wage discrimination .claim must show, as part of his [or her] prima facie burden, that he [or she] was paid less, or given a lesser raise, than other similarly situated non-protected class employees.") (citation omitted); *Austin v. Ford Models, Inc.*, 149 F.3d 148, 154 (2d Cir.1998) (stating that a former employee failed to allege a prima facie case of age discrimination under the ADEA with regard to provision of overtime pay, where former employee did not allege that overtime pay was given only to employees younger than her, former employee admitted that overtime was paid to other similarly situated female

employees, and former employee failed to allege any other facts giving rise to inference of discrimination); *Johnson v. Univ. of Wis.—Eau Claire*, 70 F.3d 469, 478 (7th Cir.1995) (holding that a prima facie case in the wage discrimination context requires a plaintiff to produce evidence that the plaintiff was paid less than a similarly-situated employee of a non-protected class while noting that "neither the Supreme Court nor th[e Seventh] Circuit has established a definitive standard") (citation omitted); *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1018–19 (11th Cir.1994) (stating that a female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males) (citing *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir.1992)).

**60.** *See e.g., Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 719 (8th Cir.2000), *cert. denied*, 531 U.S. 1077, 121 S.Ct. 773, 148 L.Ed.2d 672 (2001) (addressing whether two jobs entail equal skill, effort, or responsibility for purposes of a Title VII wage discrimination claim requires practical judgment on the basis of all the facts and circumstances of a particular case); *Anderson v. Zubieta*, 180 F.3d 329, 339 (D.C.Cir. 1999) (discussing prima facie case of wage discrimination based on race, where plaintiffs must show membership in a protected class and that they were performing work substantially equal to that of white employees who were compensated at higher rates than they were); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1087 (3d Cir.1996) (stating that in order to establish case of unequal pay based on race in violation of Title VII, plaintiffs must demonstrate that they were performing work substantially equal to that of employees of other races who were compensated at higher rates than they were).

standard differs from the "similarity" standard and is derived from the Equal Pay Act (the EPA), 29 U.S.C. § 206(d) (1998). The EPA requires that male and female employees who perform equal work within an employer's establishment must receive equal rates of pay. *See* 29 U.S.C. § 206(d)(1).[61]

■ The EPA standard of "substantial equality" establishes a higher degree of job similarity than the Title VII standard of "similar situation." *Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 570 A.2d 903, 909 (1990) (stating that "Title VII, with its broader approach to discrimination, requires a less-exacting degree of job similarity than is necessary to bring an EPA action, with its sharper focus on employment and wage discrimination against females") (citations omitted). There is no equivalent statutory provision to the EPA in Hawai'i inasmuch as all discriminatory employment practices are covered under HRS § 378–2. Consequently, it makes little sense to consider EPA case law in analyzing compensation discrimination claims brought under HRS § 378–2.[62]

Based on the foregoing, we hold that a plaintiff must satisfy the following three steps to prevail on his or her compensation discrimination claim under HRS § 378–2:(1) the plaintiff must first establish a prima facie case of such discrimination by demonstrating (a) that the plaintiff is a member of a protected class, (b) that the plaintiff's employment situation is similar to that of an employee or employees who are not members of the protected class, *see Amro v. Boeing, Co.*, 232 F.3d 790, 797–98 (10th Cir.2000); *Austin v. Ford Models, Inc.*, 149 F.3d 148, 153 (2d Cir.1998); *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1018–19 (11th Cir.1994), and (c) that the employee or employees are compensated at higher rates than the plaintiff; (2) if the plaintiff establishes a prima facie case of compensation discrimination, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the pay

**61.** In an Equal Pay Act case, the plaintiff has the burden of establishing a prima facie case of discrimination by showing that employees of the opposite sex were paid different wages for equal work.... To make out a prima facie case, the plaintiff bears the burden of showing that the jobs being compared are "substantially equal."

*Stanley v. University of Southern California*, 178 F.3d 1069, 1073–74 (9th Cir.), *cert. denied*, 528 U.S. 1022, 120 S.Ct. 533, 145 L.Ed.2d 413 (1999) (citations omitted). The EPA defines "equal work" as "jobs[,] the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions[.]" *29 U.S.C. § 206(d)(1)*.

If the plaintiff establishes a prima facie case, the burden shifts to the employer to prove that the pay difference was based on one or more of four statutory defenses: (1) a seniority system, (2) a merit system, (3) a system that measures quantity or quality of production, or (4) any factor other than sex. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

The so-called Bennett Amendment, 42 U.S.C. § 2000e–2(h), incorporated four statutory defenses under the EPA into Title VII wage discrimination claims based on sex. In the 1970s, the majority of courts interpreted the Bennett Amendment to mean that a plaintiff bringing pay discrimination cases under Title VII must show that the jobs at issue were equal as required under the EPA. *See* Kimberly J. Houghton, *The Equal Pay Act of 1963: Where Did We Go Wrong?*, 15 Lab.Law. 155, 168 (1999). However, in *Washington v. Gunther*, 452 U.S. 161, 182, 101

S.Ct. 2242, 68 L.Ed.2d 751 (1981), the United States Supreme Court held that the fact that female plaintiffs did not meet the "equal work" standard of the EPA did not preclude them from proceeding under Title VII. *Id.* at 181–82, 101 S.Ct. 2242 (Rehnquist, J., dissenting).

**62.** In at least one state, the state's highest court has decided to follow the EPA standard in a sex-based wage discrimination claim brought under its civil rights statute. *See Grigoletti*, 570 A.2d at 913 (holding that "in a case brought under the [Law Against Discrimination] presenting a gender-discrimination claim based on the payment of unequal wages for the performance of substantially equal work, the standards and methodology of the EPA should be followed"). That case is distinguishable. First, "the [New Jersey Supreme Court] has never embraced the *McDonnell Douglas* test literally, invariably or inflexibly." *Id.* at 907.

On the other hand, while noting that "a federal court's interpretation of Title VII is not binding[,]" *Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649, and that "federal employment discrimination authority is not necessarily persuasive," *Shoppe*, 94 Hawai'i at 377, 14 P.3d at 1058 (citing *Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649 (citations omitted)), this court has employed the *McDonnell Douglas* framework as "a general framework for analyzing unlawful discrimination claims." *Id.* at 377–81, 14 P.3d at 1058–60. Second, New Jersey "has long had an Equal Pay Act, [New Jersey Statutes Annotated] 34:11–56.2, directed specifically toward wage discrimination against females." *Grigoletti*, 570 A.2d at 911.

differences, *see Shoppe,* 94 Hawai'i at 378–79, 14 P.3d at 1059–60; and (3) if the defendant articulates such a reason, the burden shifts back to the plaintiff to show evidence demonstrating that the reason given by the defendant is pretextual. *See Shoppe,* 94 Hawai'i at 379, 14 P.3d at 1060. This three-prong test is consistent with the *McDonnell Douglas* framework this court has followed in *Shoppe, Sam Teague,* and *Furukawa.*

In this case, the parties do not dispute that Plaintiff is a member of the protected class.[63] *See Shoppe,* 94 Hawai'i at 378, 14 P.3d at 1059. However, Plaintiff's evidence does not support the second element of the prima facie case. In other words, the evidence does not demonstrate that Plaintiff was similarly situated to the employees with whom he compares himself. Plaintiff asserts that even if he was a "supervisor," he was subject to Jonathan's supervision and to the same employee manual and company policies as other employees. Assuming *arguendo* that Plaintiff was "another employee" as he argues, he has not shown that his work was comparable to that of the named younger employees.

As to Loando, the J–2 desk was Loando's only desk assignment. Therefore, he would receive a salary on that desk. In contrast, the J–2 desk was one of the five desks on which Plaintiff had worked. Plaintiff was paid a salary, though not specific to the J–2 desk.[64] No evidence was introduced to demonstrate that his work was similar to the work done by Kamaka, Wright, and Stoddard. Plaintiff cannot compare the compensation an employee received on a desk that may or may not have constituted his or her entire work arrangement with what he received as to the same desk, when it was only one of five desks he worked. He has not demonstrated that his work was comparable to that of those receiving commissions on the

desks or that the fact that he did not receive commissions on those desks resulted in a lower total compensation. Hence, he fails to establish a prima facie case. We therefore affirm the court's directed verdict in Defendants' favor on the compensation discrimination claim.

## XVI.

■ Plaintiff argues that the court erred in granting directed verdicts on Jonathan's and Fred's liability in their individual capacities. Plaintiff does not dispute the lack of individual liability for the unpaid wage claim. We have affirmed the directed verdict in Defendants' favor on the compensation discrimination claim. The issue remaining is Jonathan's and Fred's individual liability with respect to the retaliation claim.

Leder testified that Jonathan was the person who decided to change the locks, was responsible for distributing the keys, and had the sole discretion in deciding who would receive a Christmas bonus. As mentioned earlier, Plaintiff testified that Fred related he had told Jonathan not to pay Plaintiff a Christmas bonus because of the HCRC complaint. Fred remembered attending a meeting to discuss the complaint, but denied making the statement. When Plaintiff's counsel asked him if he remembered any of the specifics of the conversations which took place at the meeting, Fred said, "No."

HRS § 378–2(2) and (3) provide in pertinent part that it is "an unlawful discriminatory practice: (2) *[f]or any employer ... to discharge, expel, or otherwise discriminate against any individual because* the individual *... has filed a complaint ...* in any proceeding respecting the discriminatory practices prohibited under this part" or "(3)

---

**63.** "The ADEA provides anti-discrimination protections for employees aged forty and over." *Shoppe,* 94 Hawai'i at 377, 14 P.3d at 1058. However, neither HRS § 378–2 nor *Shoppe,* Hawaii's first case involving age discrimination under HRS § 378–2, establishes a specific age for such discrimination.

**64.** Plaintiff claimed as unpaid wages, commissions on every desk he claimed to have worked. Although he has claimed commissions on the J–2, J–7, and J–8 desks in addition to other desks

with respect to the unpaid wage claim, he ignores the J–7 and J–8 desks in his compensation discrimination claim. In his unpaid wage claim, Plaintiff uses Miyasaki's testimony that she collected $30,000 per month on the J–7 and J–8 desks to calculate his unpaid commissions. In this compensation discrimination claim, Plaintiff ignores the fact that Miyasaki, who was six years older than him, received a salary plus commissions on the J–7 and J–8 desks.

[f]or *any person whether an employer, employee, or not, to aid, abet, incite, compel, or coerce* the doing of any [such] practices ... or to attempt to do so[.]" (Emphases added.) The terms "employer" and "person" are defined in HRS § 378-1 (1993) as follows:

**Definitions.** As used herein:

. . . .

*"Employer" means any person,* including the State or any of its political subdivisions and any agent of such person, having one or more employees, but shall not include the United States.

. . . .

*"Person" means one or more individuals,* and includes, but is not limited to, partnerships, associations, or corporations, legal representatives, trustees, trustees in bankruptcy, receivers, or the State or any of its political subdivisions.

(Emphases added.) Retaliation is an unlawful discriminatory practice under HRS § 378-2(2), if established. Based on events related at trial, a jury could find acts of retaliation. Thus, when conflicting evidence is disregarded, *see Furukawa,* 85 Hawai'i at 11–12, 936 P.2d at 647–48, Plaintiff's and Leder's testimony could support a finding of HRS § 378-2(3) violations by Jonathan.

Defendants argue that Fred cannot be held personally liable because (1) he engaged only in a "brief conversation concerning the bonus"; (2) the decision to give a bonus or not was ultimately left to Jonathan; and (3) he did not participate in managing Pacific or Reliable or in any decisions concerning Plaintiff. HRS § 378-2(3), however, provides that *"any person* whether an employer, employee,

or not" can be held liable for "aid[ing], abet[ting], *incit[ing],* compel[ling], or coerc[ing] the doing of any discriminatory practices forbidden by this part." [65] (Emphases added.) Thus, under the broad language of HRS § 378-2(3), Fred can be liable even if he was "offering advice, not making any decision." As indicated previously, Fred was an 80% owner of the stock of RECOA, which was an 80% owner of Reliable. Taking as true that Fred told Jonathan Plaintiff should not receive a bonus, Fred could be said to have at least incited the doing of the discriminatory practice forbidden by HRS § 378-2(2), in violation of HRS § 378-2(3).

"[D]isregarding conflicting evidence," *Furukawa,* 85 Hawai'i at 11, 936 P.2d at 647, and giving Plaintiff's evidence "all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in [Plaintiff's] favor," *id.* at 12, 936 P.2d at 648 (internal quotation marks and citations omitted), it cannot be said that "there is no evidence to support a jury verdict in [Plaintiff's] favor," *id.* (internal quotation marks, citations, and brackets omitted), on the issue of Jonathan's and Fred's liability on the retaliation claim. Thus, the court erred in granting these directed verdicts. [66]

## XVII.

The court awarded Plaintiff attorney's fees [67] and costs in the amount of $6,424.50 against Reliable and $86,142.67 against Pacific [68] based on HRS § 378-5(c) [69] for the retaliation verdict under HRS § 378-2(2) and on HRS § 388-11(c) [70] for the un-

---

**65.** This part refers to Part I, "Discriminatory Practices," of chapter 378, "Employment Practices."

**66.** If Jonathan and Fred are found individually liable for the retaliation claim on remand, they will be liable for attorney's fees under HRS § 388-11(c).

**67.** As stated *supra,* Plaintiff's counsel was retained on a one-third contingency fee basis.

**68.** The court did not separate out costs and attorney's fees as to each defendant. Based on our calculation, the court awarded $6,201.14 attorney's fees and costs of $223.35 against Reliable

and $83,147.86 attorney's fees and costs of $2,994.82 against Pacific.

**69.** HRS § 378-5(c) provides that "[i]n any action brought under this part, the court, in addition to any judgment awarded to the plaintiff or plaintiffs, *shall allow costs of action, including costs of fees of any nature and reasonable attorney's fees, to be paid by the defendant."* (Emphasis added.)

**70.** HRS § 388-11(c) provided in part as follows:

(c) The court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow interest of six per cent per year from the date the wages were due, *costs of action, including*

paid wage claim verdict under HRS § 388–10.[71] The order granting Plaintiff's motion stated in pertinent part as follows:

> Inasmuch as reasonable attorneys' fees are, statutorily, a part of the claim, the court will award all of [Plaintiff's counsel]'s time prosecuting the case or $89,349.00. The time of Tracy Batstone, a paralegal, is neither attorneys' fees nor costs of action or costs of fees. The total costs are $3,218.17, which excludes sales tax on expenses, parking and a transcript of the June 27, 1997 hearing. . . .

The attorney's fees awarded represents the "lodestar" amount,[72] which equals the number of hours Plaintiff's counsel spent on this case multiplied by his hourly rate.[73] *See Chun v. Board of Trustees of Employees' Retirement Sys. of State of Hawai'i*, 92 Hawai'i 432, 434 n. 1, 992 P.2d 127, 129 n. 1 (2000).

Plaintiff cross-appeals from the award, maintaining that attorney's fees should be doubled and paralegal fees and other miscellaneous costs should have been included in the award. Citing *Mangold v. California Public Utils. Comm'n*, 67 F.3d 1470 (9th Cir.1995),[74] Plaintiff contends that the court erred in relying on *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the United States Supreme Court case prohibiting enhancement of an attorney's fee award beyond the lodestar amount in connection with federal fee-shifting statutes.[75] Additionally, as supporting his request for a contingent fee award, Plaintiff cites *Chun*, *supra*, and *Montalvo v. Chang*, 64 Haw. 345, 641 P.2d 1321 (1982), *overruled in part on other grounds by Chun*, 92 Hawai'i at 445, 992 P.2d at 140.

Doubling the lodestar fee, according to Defendants, would result in conferring more attorney's fees than Plaintiff had agreed to pay his attorney and that the excess would be an additional damage award prohibited by *Morrison–Knudsen Co., Inc. v. Makahuena Corp.*, 5 Haw.App. 315, 322, 690 P.2d 1310, 1315, *reconsideration denied*, 5 Haw.App. 683, 753 P.2d 253, *cert. denied*, 67 Haw. 686, 744 P.2d 781 (1984). *Morrison–Knudsen* held that it is generally an abuse of discretion to award fees in excess of the amount the prevailing parties had agreed to pay their attorneys. *See id.* Defendants maintain that the lodestar amount awarded by the trial court should be affirmed because "the court found that amount to be reasonable." This court reviews the amount of a trial court's award of attorney's fees under "the abuse of the discretion standard." *Chun*, 92 Hawai'i at 439, 992 P.2d at 134 (internal quotation marks and citation omitted).

### A.

As set forth, *supra*, HRS §§ 378–5(c) and 388–11(c) are fee-shifting statutes.[76]

---

> costs of fees of any nature, and reasonable attorney's fees, to be paid by the defendant. . . .
> (Emphasis added.)

**71.** *See supra* notes 69 and 70. HRS §§ 378–5(c) and 388–11(c) both provide that the court shall allow "costs of fees of any nature and reasonable attorney's fees, to be paid by the defendant."

**72.** *See* discussion *infra* part XVIII and note 80. There is "a 'strong presumption' that the lodestar represents the 'reasonable' fee[.]" *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*)).

**73.** The hourly rate of Plaintiff's counsel was $195. The number of hours Plaintiff's counsel spent on this case, excluding paralegal hours, was 398.50.

**74.** In *Mangold*, the Ninth Circuit Court of Appeals held that *Dague* was inapplicable in that case, based on its conclusion that state law applied in determining both the right to attorney's fees and the method of calculating the fees in a federal diversity case. *See* 67 F.3d at 1478–79. Consequently, the *Mangold* court enhanced the plaintiff's attorney's fees, observing that "California law permits such enhancements under state fee-shifting statutes." *Id.* at 1478 (citing *City of Oakland v. Oakland Raiders*, 203 Cal.App.3d 78, 249 Cal.Rptr. 606 (1988), and *Serrano v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977)).

**75.** *See* discussion *infra* part XVIII.B.

**76.** "Fee shifting cases generally arise out of statutory causes of action 'that include provisions for attorney's fees—typically characterized as being "reasonable" in amount—to be awarded to the prevailing party.'" *Chun*, 92 Hawai'i at 441 n.

*See supra* notes 69 & 70. The attorney's fee award in this case was based on such statutes, an exception to "the 'American Rule,' [which provides that] each party is responsible for paying his or her own litigation expenses." *Chun*, 92 Hawai'i at 439, 992 P.2d at 134 (internal quotation marks and citations omitted).

### B.

■ Before addressing the issue of contingency enhancement, we observe that the fees awarded were calculated on the number of hours Plaintiff's counsel spent on the entire case. However, under the statutes, fees are to be awarded only on those claims on which Plaintiff prevailed.[77]

■ In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the United States Supreme Court addressed the issue of "whether a partially prevailing plaintiff may recover an attorney's fee for legal services on unsuccessful claims." *Id.* at 426, 103 S.Ct. 1933. According to *Hensley*, the trial court must determine (1) whether or not unsuccessful claims are related to successful claims, *see id.* at 434, 103 S.Ct. 1933, and (2) whether or not "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award[.]" *Id.* Unsuccessful claims are deemed unrelated if they are "distinctly different claims for relief that are based on different facts and legal theories." *Id.* Thus, "even where the claims are brought against the same defendants ... [,] counsel's work on one claim [may] be unrelated to his [or her] work on another claim[,]" *id.* at 434–35, 103 S.Ct. 1933, "work on [such]

an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved[,]" *id.* at 435, 103 S.Ct. 1933 (internal quotation marks and citations omitted), and "the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Id.* at 440, 103 S.Ct. 1933.

■ On the other hand, if "the plaintiff's claims for relief ... involve a common core of facts or [are] based on related legal theories [and m]uch of counsel's time [is] devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis[,]" *id.* at 435, 103 S.Ct. 1933, "[s]uch a lawsuit cannot be viewed as a series of discrete claims." *Id.* In that situation, "a plaintiff who has won substantial relief should not have his [or her] attorney's fee reduced simply because the [trial] court did not adopt each contention raised." *Id.* at 440, 103 S.Ct. 1933.

■ As to the required level of success, "[w]here a plaintiff has obtained excellent results, his [or her] attorney should recover a fully compensatory fee" because "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." *Id.* at 435, 103 S.Ct. 1933. "If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount ... even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith."[78] *Id.* at 436, 103 S.Ct. 1933.

8, 992 P.2d at 136 n. 8 (citing *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 251 (1985) [hereinafter *Third Circuit Report* ] ).

**77.** Typical federal fee-shifting statutes "authorize a court to 'award costs of litigation (including reasonable attorney ... fees)' to a 'prevailing or substantially prevailing party.'" *Dague*, 505 U.S. at 561–62, 112 S.Ct. 2638 (quoting 42 U.S.C. § 6972(e) and 33 U.S.C. § 1365(d) (emphasis omitted)). Thus, unlike the Hawai'i fee-shifting statutes, the federal statutes explicitly state that the award of costs which include attorney's fees to a party is based on the fact that the

party "prevail[ed] or substantially prevail[ed]." 42 U.S.C. § 6972(e); 33 U.S.C. § 1365(d).

**78.** In *Hensley*, the plaintiffs brought an action on behalf of all persons involuntarily confined at a forensic unit of a state hospital, challenging the constitutionality of treatment and conditions at the unit in six general areas: physical environment; individual treatment plans; least restrictive environment; visitation, telephone, and mail privileges; seclusion and restraint; and staffing. *See* 461 U.S. at 427–28, 103 S.Ct. 1933. In that case, the trial court found constitutional violations as to the first five areas. *See id.* at 427, 103 S.Ct. 1933. To illustrate when the fees based on

Because Plaintiff did not prevail in all of his claims, the trial court must engage in a *Hensley* analysis in order to determine whether it is reasonable to award attorney's fees for the entire time Plaintiff's counsel spent on the case. If the court awards attorney's fees for the time a plaintiff's counsel spent on unsuccessful claims which are unrelated to the plaintiff's successful claims, the award will not constitute "reasonable attorney's fees" under Hawai'i fee-shifting statutes. Therefore, we direct on remand that the court consider whether Plaintiff's successful and unsuccessful claims "involve[d] a common core of facts or [were] based on related legal theories," *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933, in arriving at attorney's fees which are reasonable.[79] We also instruct that the court render written findings of fact and conclusions of law in support of its decision.

## XVIII.

We examine, then, Plaintiff's claim for enhancement of his attorney's fees.

hours reasonably expended on the whole litigation can be excessive, the Court stated as follows:

In this case, for example, the District Court's award of fees based on 2,557 hours worked may have been reasonable in light of the substantial relief obtained. But had [the plaintiffs] prevailed on only one of their six general claims, for example the claim that [the defendants]' visitation, mail, and telephone policies were overly restrictive, a fee award based on the claimed hours clearly would have been excessive.

*Id.* at 436, 103 S.Ct. 1933 (internal citation omitted).

**79.** In this case, it seems clear that Plaintiff's unsuccessful claim, the compensation discrimination claim, was related to one of his successful claims, the retaliation claim. It is not as clear whether his other successful claim, the unpaid wage claim, was related to the compensation discrimination claim. However, we do not make a determination regarding the relationship between Plaintiff's successful and unsuccessful claims because we vacate and remand the attorney's fee award issue for the court's consideration.

**80.** To obtain the lodestar amount, Third Circuit district courts determine "the hours spent by the attorneys—how many hours were spent in what manner by which attorneys" and the value of the

### A.

Originally, "the size of the fee award was left to the court's discretion, with the general standard being reasonableness under the circumstances of the particular case. Judges relied on a variety of factors in setting reasonable amounts for fee awards[.]" *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 242 (1985) [hereinafter *Third Circuit Report*]. Federal courts gradually developed methodologies to determine reasonableness. In *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168 (3d Cir.1973) (*Lindy I*), and 540 F.2d 102, 115–18 (3d Cir.1976) (*Lindy II*), the Third Circuit set forth guidelines for the "lodestar" method.[80] In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), *overruled on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), the Fifth Circuit took a different approach.[81] "Most circuits that have defined their fee-setting standards have followed the lead of the Third Circuit." *Third Circuit Report*, 108 F.R.D. at 244.

attorneys' services. *Lindy I*, 487 F.2d at 167. According to that circuit, "in addition to the 'lodestar', the court's computation of the value of attorneys' services should reflect two other factors[:] the contingent nature of success and the quality of the attorney's work." *Lindy II*, 540 F.2d at 112.

**81.** The Fifth Circuit instructed the district court to consider the following guidelines: (1) "[t]he time and labor required[;]" (2) "[t]he novelty and difficulty of the questions[;]" (3) "[t]he skill requisite to perform the legal service properly[;]" (4) "[t]he preclusion of other employment by the attorney due to acceptance of the case[;]" (5) "[t]he customary fee for similar work in the community[;]" (6) "[w]hether the fee is fixed or contingent[;]" (7) "[t]ime limitations imposed by the client or the circumstances[;]" (8) "[t]he amount involved and the results obtained[;]" (9) "[t]he experience, reputation, and ability of the attorneys[;]" (10) "[t]he 'undesirability' of the case[;]" (11) "[t]he nature and length of the professional relationship with the client[;]" and (12) "[a]wards in similar cases." *Johnson*, 488 F.2d at 717–19 (italics omitted).

In *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), *overruled in part by Dague, supra*, the Ninth Circuit adopted the *Johnson* approach.

In *Hensley*, the United States Supreme Court established a method of calculating reasonable attorney's fees according to the lodestar method, *see* 461 U.S. at 433, 103 S.Ct. 1933, and adjustment of the lodestar fees based on consideration of the twelve factors in *Johnson*. *See id.* at 434 n. 9, 103 S.Ct. 1933. In *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Court narrowed its *Hensley* ruling by holding that courts can consider "the quality of representation" only in exceptional cases and cannot consider the "novelty and complexity of the issues" and the "results obtained" in determining whether or not to increase the lodestar fee. *Id.* at 898–900, 104 S.Ct. 1541. *Blum* did not determine whether the risk of nonpayment can justify enhancement of the lodestar fees. *Id.* at 901 n. 17, 104 S.Ct. 1541. Throughout this period, "[m]ost Courts of Appeals ... allowed upward adjustment of fee awards because of the risk of loss factor." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 717, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley II* ) (footnote omitted).[82]

### B.

According to *Dague*, in *Delaware Valley II*, the United States Supreme Court faced, but was unable to resolve, the question of whether a court may enhance an award of reasonable attorney's fees under federal fee-shifting statutes for a contingency risk. *See Dague*, 505 U.S. at 559, 112 S.Ct. 2638. The majority in *Delaware Valley II* rejected the application of a multiplier to the facts of the case. *See* 483 U.S. at 728–31, 734, 107 S.Ct. 3078.

In a 4–1–4 split, the Court could not agree on whether such enhancement should always be prohibited as a matter of law. Justice White's opinion, joined by Chief Justice

Rehnquist, Justice Powell, and Justice Scalia, determined that such enhancement was not permitted. *See id.* at 727, 107 S.Ct. 3078. The four justices contended that "enhancing fees for risk of loss forces losing defendants to compensate plaintiff's lawyers for not prevailing against defendants in other cases" and that such a result would be contrary to Congress' decision to award fees only to prevailing parties. *Id.* at 724–25, 107 S.Ct. 3078. According to these four justices, "[s]uch enhancement also penalizes the defendants who have the strongest case; and in theory, at least, would authorize the highest fees in cases least likely to be won and hence encourage the bringing of more risky cases, especially by lawyers whose time is not fully occupied with other work." *Id.* at 725, 107 S.Ct. 3078. Furthermore, they reasoned that "[b]ecause it is difficult ever to be completely sure that a case will be won, enhancing fees for the assumption of the risk of nonpayment would justify some degree of enhancement in almost every case." *Id.* It was concluded that even if enhancement under fee-shifting statutes was permitted, the lower court erred in doing so. *See id.* at 728, 107 S.Ct. 3078.

Justice O'Connor, concurring in part and concurring in the judgment, agreed that the facts of the case did not warrant enhancement. *See id.* at 734, 107 S.Ct. 3078. However, "[f]or the reasons explained by the dissent," she concluded that "Congress did not intend to foreclose consideration of contingency in setting a reasonable fee under fee-shifting provisions[.]" *Id.* at 731, 107 S.Ct. 3078. According to O'Connor, "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class*, rather than on an assessment of the 'riskiness' of any particular case." [83] *Id.* (emphasis in original).

---

**82.** We refer to this case as *Delaware Valley II* to be consistent with the reference in *Dague*. The United States Supreme Court decided a case preceding the 1987 *Delaware Valley* case between the same parties in 1986, *see Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), and refers to the preceding case as *Delaware Valley I* and the 1987 case as *Delaware Valley II*. *See Dague*, 505 U.S. at 559, 112 S.Ct.

2638; *Delaware Valley II*, 483 U.S. at 713–14, 107 S.Ct. 3078.

**83.** Justice O'Connor proposed the following three constraints on a court's discretion in determining a reasonable attorney's fee: (1) "a determination of how a particular market compensates for contingency as controlling future cases involving the same market," *Delaware Valley II*, 483 U.S. at 733, 107 S.Ct. 3078, (2) "the burden

Justice Blackmun's dissent, joined by Justices Brennan, Marshall, and Stevens, concluded that statutory fees may be enhanced for contingency. *See id.* at 754, 107 S.Ct. 3078. The dissent contended that a "reasonable fee" must be "adequate to attract competent counsel, but ... not produce windfalls to attorneys." *Id.* at 735, 107 S.Ct. 3078 (ellipses points in original, internal quotation marks and citations omitted). According to the dissent, "a fee that may be appropriate in amount when paid promptly and regardless of the outcome of the case, may be inadequate and inappropriate when its payment is contingent upon winning the case." *Id.* The dissent argued that "[a]ll else being equal, attorneys naturally will prefer cases where they will be paid regardless of the outcome, rather than cases where they will be paid only if they win" and that "[c]ases of the latter type are inherently riskier and an attorney properly may expect greater compensation for their successful prosecution." *Id.* at 736, 107 S.Ct. 3078 (citing *Lindy I,* 487 F.2d at 168 ("No one expects a lawyer whose compensation is contingent upon his [or her] success to charge, when successful, as little as he [or she] would charge a client who in advance had agreed to pay for his [or her] services, regardless of success.") (internal quotation marks and citations omitted)).

Basic to the dissent's position was that enhancement is necessary in order to achieve "the basic purpose of statutory attorney fees—ensuring that private citizens ... have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." *Id.* at 735, 107 S.Ct. 3078 (internal quotation marks and citations omitted). It was observed that

> [i]n many cases, a client will be unable to pay for counsel or will be unwilling to assume the risk of liability for attorney's fees, even if the public interest may be significantly aided by the private litigation. Other cases simply will not generate signif-

icant funds, even if they are successful. Many actions seek only declaratory or injunctive relief, many are hampered by immunity doctrines and special defenses available to the defendants, and many will generate only small awards.

*Id.* at 749, 107 S.Ct. 3078 (citing H.R.Rep. No. 94–1558, 94th Cong., 2d Sess. 1, at 9 (1976); *Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); T. Rowe, Jr., *The Legal Theory of Attorney Fee Shifting: A Critical Overview,* 1982 Duke L.J. 651, 676 (1982) [hereinafter *The Legal Theory* ] ). Applying its conclusion that contingency enhancements should be allowed in federal fee-shifting cases to the facts of the case, the dissent would have remanded the award in this case to the district court for further findings. *See id.* at 754–55, 106 S.Ct. 2686.

### C.

In *Dague,* the Court held that "enhancement for contingency is not permitted under the fee-shifting statutes at issue[,]" 505 U.S. at 567, 112 S.Ct. 2638, resolving the issue which arose in *Delaware Valley II. See id.* at 559, 112 S.Ct. 2638. The majority explained its sharply divided decision in *Delaware Valley II, see id.* at 561, 112 S.Ct. 2638, and reiterated the arguments made by the *Delaware Valley II* principal opinion. *See* discussion *supra* part XVIII.B. First, it noted that "an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar" because "the difficulty of establishing ... merits" of the claim is "reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." *Dague,* 505 U.S. at 562–63, 112 S.Ct. 2638 (citing *Blum,* 465 U.S. at 898–99, 104 S.Ct. 1541). Second, the Court maintained that "[t]o award a contingency enhancement under a fee-shifting stat-

---

of proving the degree to which the relevant market compensates for contingency" on the fee applicant, *id.* (citing *Blum,* 465 U.S. at 898, 104 S.Ct. 1541 ("The burden of proving that such an adjustment is necessary to the determination of a reasonable fee is on the fee applicant.")); *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933 ("Where

settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.")), and (3) "no[ ] ... enhancement based on 'legal' risks or risks peculiar to the case." *Id.* at 734, 107 S.Ct. 3078.

ute would in effect pay for the attorney's time (or anticipated time) in cases where his [or her] client does not prevail." *Id.* at 565, 112 S.Ct. 2638 (emphasis omitted). Third, the Court explained that "[it] ha[d] 'generally turned away from the contingent-fee model' ... 'to the lodestar model[,]' " *id.* at 566–67, 112 S.Ct. 2638 (quoting *Venegas v. Mitchell,* 495 U.S. 82, 87, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990)), and "[c]ontingency enhancement is ... not consistent with [the Court's] general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee." *Id.* at 566, 112 S.Ct. 2638. Finally, the Court observed that "the interest in ready administrability that has underlain our adoption of the lodestar approach ... and the related interest in avoiding burdensome satellite litigation ... counsel strongly against adoption of contingency enhancement." *Id.* (citing *Hensley,* 461 U.S. at 433, 437, 103 S.Ct. 1933).

Justice Blackmun's dissent, joined by Justice Stevens, argued that enhancement should be permitted for a "reasonable" attorney's fee award for two reasons. First, the dissent explained that "a 'reasonable' fee is to be a 'fully compensatory fee,' " *id.* at 567, 112 S.Ct. 2638 (quoting *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933), "and is to be 'calculated on the basis of rates and practices prevailing in the relevant market.' " *Id.* at 567, 112 S.Ct. 2638 (quoting *Missouri v. Jenkins,* 491 U.S. 274, 286, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)). Second, according to the dissent, "it is a fact of the market that an attorney who is paid only when his [or her] client prevails will tend to charge a higher fee than one who is paid regardless of outcome, and relevant professional standards long have recognized that this practice is reasonable." *Id.* (footnotes omitted).

Justice O'Connor's separate dissenting opinion also disagreed with the majority's holding that "a 'reasonable' attorney's fee can never include an enhancement for cases taken on contingency." *Id.* at 575, 112 S.Ct. 2638. She agreed with Justice Blackmun's contention that "when an attorney must choose between two cases—one with a client who will pay the attorney's fees win or lose and the other who can only promise the statutory compensation if the case is successful—the attorney will choose the fee-paying client, unless the contingency client can promise an enhancement of sufficient magnitude to justify the extra risk of nonpayment." *Id.* Therefore, Justice O'Connor proposed that "a reasonable fee should be one that would 'attract competent counsel,' and in some markets this must include the assurance of a contingency enhancement if the plaintiff should prevail." *Id.* (quoting *Delaware Valley II,* 483 U.S. at 733, 107 S.Ct. 3078 (O'Connor, J., concurring in part and concurring in judgment)). As she did in *Delaware Valley II,* Justice O'Connor again argued for enhancement " 'based on the difference in market treatment of contingent fee cases as a class, rather than on an assessment of the "riskiness" of any particular case.' " *Id.* at 576, 106 S.Ct. 3088 (quoting *Delaware Valley II,* 483 U.S. at 731, 107 S.Ct. 3078 (O'Connor, J., concurring in part and concurring in judgment) (emphasis omitted)).

## XIX.

### A.

Following *Dague,* federal courts and some state courts have prohibited trial courts from considering the risk of nonpayment in calculation of the amount of reasonable attorney's fees. *See e.g., Davis v. Mutual Life Ins. Co. of New York,* 6 F.3d 367, 381–82 (6th Cir. 1993), *cert. denied,* 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994); *Eirhart v. Libbey–Owens–Ford Co.,* 996 F.2d 846, 852 (7th Cir.1993); *Cann v. Carpenters' Pension Trust Fund for N. California,* 989 F.2d 313, 318 (9th Cir.1993); *Dutcher v. Randall Foods,* 546 N.W.2d 889, 897–98 (Iowa 1996); *Meyers v. Chapman Printing Co., Inc.,* 840 S.W.2d 814, 826 (Ky.1992). However, in *Rendine v. Pantzer,* 141 N.J. 292, 661 A.2d 1202 (1995), the New Jersey Supreme Court held that under its fee-shifting statute,[84] "the

---

84. The New Jersey fee-shifting statute provides as follows:

 10:5–27.1. Attorneys fees

In any action or proceeding brought under this act, the prevailing *party may be awarded a reasonable attorney's fee as part of the cost,*

trial court ... should consider whether to increase [the lodestar] fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." *Id.* at 1228. The court concluded that "a counsel fee awarded under a fee-shifting statute cannot be 'reasonable' unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed." *Id.* In differing with *Dague,* it asserted that

> the case for contingency enhancement "has nothing to do with the amount of time lawyers invest in losing cases ... [but] the desire to enable parties to compete for legal services in the private market. ... [because a] lawyer given a choice between an unenhanced hourly rate in a fee award case and an equal rate in a case where payment is certain will have a strong incentive to decline the fee award case."

*Id.* (quoting C. Silver, *Incoherence and Irrationality in the Law of Attorneys' Fees,* 12 Rev. Litig. 301, 331–32 (1993) (footnote omit-

> provided however, that no attorney's fee shall be awarded to the respondent unless there is a determination that the charge was brought in bad faith.
> (Emphasis added.)

**85.** *Chun* held, *inter alia,* that trial courts have discretion in deciding whether to employ the percentage-of-fund method or the lodestar method for calculating attorney's fees in common fund cases. *See* 92 Hawai'i at 445, 992 P.2d at 140.

**86.** *Montalvo* held, *inter alia,* that the trial court should utilize the lodestar fee method in awarding attorney's fees in class actions under the common fund doctrine. *See* 64 Haw. at 358–61, 641 P.2d at 1330–32.

**87.** *Chun* explains common fund cases as "[o]ne of the earliest exceptions to the 'American Rule[.]'" 92 Hawai'i at 439, 992 P.2d at 134 (citing *Montalvo,* 64 Haw. at 353, 641 P.2d at 1327). "'The common fund doctrine provides that a private plaintiff, or his [or her] attorney, whose efforts create, discover, increase[,] or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his [or her] litigation, including attorneys' fees.'" *Id.* at 439–40, 992 P.2d at 134–35 (quoting *Montalvo,* 64 Haw. at 352, 641 P.2d at 1327) (some brackets in original and some added).

ted) [hereinafter *Incoherence and Irrationality* ]).

**B.**

■ Whether enhancement of the lodestar fee is permissible under fee-shifting statutes when a contingent fee arrangement is involved has yet to be decided in this jurisdiction. *Chun*[85] and *Montalvo*[86] discussed the issue of the lodestar fee in the context of attorney's fees governed by common fund principles.[87] *See Chun,* 92 Hawai'i at 434 & n. 1, 445, 992 P.2d at 129 & n. 1, 140; *Montalvo,* 64 Haw. at 358–61, 641 P.2d at 1330–32.

■ *Montalvo* provides that "the contingent nature of success" is one of the factors to be considered for possible adjustment of the lodestar fee, 64 Haw. at 359, 641 P.2d at 1331, and, in *Chun,*[88] this court adhered to *Montalvo*'s explication of the mechanics of the lodestar method. *See Chun,* 92 Hawai'i at 445, 992 P.2d at 140. Because of differences between statutory fee-shifting cases and common fund cases,[89] *Chun* and *Montal-*

**88.** In *Chun,* this court overruled *Montalvo* to the extent that it mandated trial courts to use the lodestar method alone in calculating attorney's fees in common fund cases. *See* 92 Hawai'i at 445, 992 P.2d at 140.

**89.** Fee-shifting statutes differ from the common fund doctrine in three important ways. First, "[u]nlike statutory fee-shifting cases, where the winner's attorneys' fees are paid by the losing party, attorneys' fees in common fund cases are not paid by the losing defendant, but by members of the plaintiff class, who shoulder the burden of paying their own counsel out of the common fund." *In re Washington Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1300 (9th Cir.1994) (citing *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478–79, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Vincent v. Hughes Air West, Inc.,* 557 F.2d 759, 769–70 (9th Cir.1977)).

Second, fee-shifting statutes are generally enacted to "strengthen the enforcement of selected ... laws by ensuring that private persons seeking to enforce those laws [can] retain competent counsel." *Dague,* 505 U.S. at 568, 112 S.Ct. 2638 (Blackmun, J., dissenting) (citations omitted). *See also Skelton v. General Motors Corp.,* 860 F.2d 250, 253 (7th Cir.1988) ("Statutory fee-shifting provisions ... reflect the intent of Congress 'to encourage private enforcement of the statutory substantive rights, be they economic or noneconomic, through the judicial process.'")

*vo* are not directly applicable to this case.[90]

## XX.

Inasmuch as *Dague* is a federal case interpreting fee-shifting provisions of federal statutes, it is not binding on this court. *Cf. Sam Teague,* 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10 (stating that " 'a federal court's interpretation of Title VII is not binding on this court's interpretation of civil rights laws adopted by the Hawai'i legislature' ") (quoting *Furukawa,* 85 Hawai'i at 13, 936 P.2d at 649 (citation omitted)); *Roxas v. Marcos,* 89 Hawai'i 91, 119, 969 P.2d 1209, 1237 (1998), *reconsideration denied,* 89 Hawai'i 91, 969 P.2d 1209 (1998) (stating that "the federal court's interpretation of the federal rule is not binding on Hawaii's interpretation of its own rule"). We conclude that *Dague* 's and *Delaware Valley II* 's dissenting opinions and the *Rendine* opinion are better reasoned than *Dague* 's majority opinion, which was followed by the court below.

### A.

Preliminarily, we regard the holding of *Mangold, supra,* cited in Plaintiff's brief, as not binding on this court because it was a federal case interpreting California state law. On the other hand, we disagree with Defen-

dants' contention that awarding a doubled lodestar fee to Plaintiff is prohibited by *Morrison–Knudsen, supra.*

In *Morrison–Knudsen,* the Intermediate Court of Appeals (the ICA) reversed the trial court's order tripling attorneys's fees. *See* 5 Haw.App. at 321–22, 690 P.2d at 1314–15. The ICA concluded that "when awarding attorneys' fees in favor of prevailing parties, it is generally an abuse of discretion to award more than the prevailing parties agree to pay their attorneys for the particular services involved." *Id.* at 322, 690 P.2d at 1315. It explained that "the excess amounts awarded cannot legitimately be characterized as attorneys' fees [and] are really damages awarded under a false label and without authority." *Id.* The ICA's conclusion was correct as applied to the facts of that case. However, its holding, *see id.,* is inapplicable to attorney's fees awarded under fee-shifting statutes based on contingency fee arrangements.

### B.

The United States Supreme Court in *Blanchard, supra,* held that a contingent fee agreement did not place a ceiling on the amount of fees recoverable under the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988. *See* 489 U.S. at 96, 109 S.Ct. 939.

---

(quoting *Third Circuit Report,* 108 F.R.D. at 250), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). In contrast, "[t]he common fund doctrine is based on the notion that not one plaintiff, but all those who have benefitted from litigation should share its costs." *Florin v. Nationsbank of Georgia,* 34 F.3d 560, 563 (7th Cir. 1994) (internal quotation marks and citations omitted).

Third, "once the [plaintiff's] attorneys secure a settlement for the class, they petition the court for compensation from the same fund[, and t]hus, their 'role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit.' " *Skelton,* 860 F.2d at 253 (quoting *Third Circuit Report,* 108 F.R.D. at 255). As a result, "[t]he court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications." *Id.* (citing *In re Fine Paper Antitrust Litig.,* 751 F.2d 562, 583 (3d Cir.1984) (discussing rule that fee requests from common fund are subject to "heightened judicial scrutiny")). On the other hand, "[b]ecause statutory fee cases involve the plaintiff (not his [or her] attorney) as claimant

and continue to be adversary proceedings, these concerns do not arise in the same way." *Id.*

**90.** *See In re Washington Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d at 1301 (holding that *Dague* 's rejection of contingency enhancements in federal fee-shifting statute cases does not apply to common fund cases); *Florin,* 34 F.3d at 562 (holding that *Dague* has no application to common fund cases); 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 3d* § 2675.1, at 395 (1998) (stating that "it now is clear that the contingent nature of a case cannot be considered as a factor to enhance the lodestar in [federal] statutory fee-shifting cases" and that "[i]n contrast, the majority of federal circuits that have ruled on the issue have held that the Supreme Court's holding in *Dague* does not apply to attorney fee calculations in common-fund cases when the lodestar analysis is used to award fees in those cases") (footnote omitted). *But see In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 822 (3d Cir.) (stating in dictum that a court using the lodestar method in a common fund case could not apply a multiplier for risk after *Dague* ), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

In that case, the plaintiff had a 40% contingent fee agreement with his attorney and recovered $10,000. *See id.* at 90, 109 S.Ct. 939. Under the agreement, the plaintiff's attorney would have been entitled to $4,000. The district court ruled that a reasonable fee would amount to $7,500 under the statute. *See id.* at 89, 109 S.Ct. 939. The Fifth Circuit reversed and reduced the award, *see id.* at 90, 109 S.Ct. 939, on the ground that " '[i]n no event, . . . should the litigant be awarded a fee greater than he [or she] is contractually bound to pay.' " *Id.* at 92, 109 S.Ct. 939 (quoting *Johnson*, 488 F.2d at 718). The United States Supreme Court disagreed and held that the trial judge should not be limited by the contingency fee arrangement between a plaintiff and his or her counsel in determining a reasonable fee. *See id.* at 96, 109 S.Ct. 939.

According to the Court, although a pre-existing fee agreement is a factor in determining the reasonableness of an attorney's fee award, "a 'reasonable attorney's fee[ ]' . . . contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff[.]" *Id.* at 93, 109 S.Ct. 939. Thus, "[s]hould a fee agreement provide less than a reasonable fee[,] . . . the defendant should nevertheless be required to pay the higher amount." *Id.*

We hold that where a court awards attorney's fees pursuant to fee-shifting statutes in cases involving contingency fee arrangements, the reasoning in *Blanchard* applies and not that of *Morrison–Knudsen*. "If a contingent-fee agreement were to govern as a strict limitation on the award of attorney's fees, an undesirable emphasis might be placed on the importance of the recovery of damages in civil rights litigation" and other statutes with fee-shifting provisions. *Blanchard*, 489 U.S. at 95, 109 S.Ct. 939. *See also Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1058 (2d

Cir.1989), *cert. denied*, 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990) (stating that "the Supreme Court instructs us that the same standards apply to other fee-shifting statutes where an award is made to the prevailing party") (citing *Hensley*, 461 U.S. at 433 n. 7, 103 S.Ct. 1933).

Fee-shifting statutes exist "not to create a special incentive to prove damages and shortchange efforts to seek effective injunctive or declaratory relief." *Blanchard*, 489 U.S. at 95, 109 S.Ct. 939. For example, if a nonprofit legal service organization represents a plaintiff and agrees to receive no compensation from the plaintiff, that fact will not bar the plaintiff from obtaining a reasonable fee award when he or she prevails. *See id.* at 94–95, 109 S.Ct. 939. Thus, in this case, the fact that doubling Plaintiff's lodestar fees would result in more fees than Plaintiff agreed to pay his attorney should not in itself prevent Plaintiff from receiving that amount. However, if the doubled amount exceeds a "reasonable" fee, Plaintiff is not entitled to the exceeded amount.[91]

## XXI.

### A.

Having decided that *Morrison–Knudsen* does not bar Plaintiff's recovery of a doubled lodestar fee, we examine whether a trial court is allowed to take contingency into account in assessing reasonable attorneys' fees under Hawai'i fee-shifting statutes. Unlike the legislative history of the federal statutes cited in *Dague* and *Delaware Valley II*, the legislative history underlying HRS §§ 378–5(c) and 388–11(c) does not provide much guidance in determining the manner by which the legislature intended to compensate a prevailing party for his or her attorney's fees.[92]

HRS §§ 388–11(c) and 378–5 do mandate an award of attorney's fees to the prevailing

---

**91.** "[Defendants are] not, however, required to pay the amount called for in a contingent-fee contract if it is more than a reasonable fee calculated in the usual way." *Blanchard*, 489 U.S. at 93, 109 S.Ct. 939.

**92.** *See* Hse. Stand. Comm. Rep. Nos. 1064, 1190, in 1989 House Journal, at 1226, 1269; Sen. Stand. Comm. Rep. Nos. 318, 739, in 1989 Senate Journal, at 943–44, 1085; Hse. Stand. Comm. Rep. No. 794, in 1963 House Journal, at 799–800; Sen. Stand. Comm. Rep. No. 676, in 1963 Senate Journal, at 900–01.

party by employing the word "shall," while the federal statutes afford district courts discretion on the issue.[93] While this difference suggests that the Hawai'i legislature firmly believed in mandatory compensation to a prevailing party in certain lawsuits, that difference alone does not lead us to decide that contingency enhancement should be permitted under Hawai'i fee-shifting statutes.[94]

### B.

▮▮▮▮ Considering the rationale against and in favor of contingency enhancements discussed in case law and scholarly commentary, we conclude that our courts should be given discretion to enhance the lodestar fee when an attorney has been retained on a contingency fee basis. We believe that a "reasonable fee" under Hawai'i fee-shifting statutes is an amount of fees that "would attract competent counsel," *Dague*, 505 U.S. at 575, 112 S.Ct. 2638 (O'Connor, J., dissenting) (internal quotation marks and citation omitted), in light of all the circumstances, and that under certain circumstances the lodestar fee may be multiplied by a factor to achieve a "reasonable" award of fees.

▮▮▮▮ In our view, contingency enhancement may at times be necessary to ensure enforcement of statutes with fee-shifting provisions. As Justice O'Connor pointed out in *Dague*, in the absence of some enhancement, the likelihood is that a competent attorney will choose a client who will pay whether the client wins or loses, over a client whose case will result in compensation through a fee-shifting statute only if the client wins. *See id.; see also The Supreme Court, 1991 Term Leading Cases, Fee Enhancement*, 106 Harv. L.Rev. 338, 347 (1992) [hereinafter *Fee Enhancement* ] (stating that "the best attorneys are more likely to avoid statutory-fee claims in favor of cases for which they will be paid win or lose; as a result, . . . laws in such areas as civil rights and environmental safety face underenforcement").

---

**93.** *See supra* notes 69 & 70.

Typical federal fee-shifting statutes, including the one at issue in *Dague* and *Delaware Valley II* and federal counterparts to HRS §§ 378–5(c) and 388–11(c) contain in pertinent part the following language:
Proceedings in vindication of civil rights.

. . . .

(b) Attorney's fees
In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C.A. § 1681 *et seq.*], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb *et seq.*], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d *et seq.*], or section 13981 of this title, *the court, in its discretion, may* allow the prevailing party, other than the United States, a *reasonable attorney's fee* as part of the costs[.] . . .
42 U.S.C.A. § 1988 (emphases added).
Enforcement provisions.

. . . .

(k) Attorney's fee; liability of Commission and United States for costs
In any action or proceeding under this subchapter *the court, in its discretion, may allow* the prevailing party, other than the Commission or the United States, a *reasonable attorney's fee* (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.
42 U.S.C.A. § 2000e–5 (emphases added.)
Citizen suits.

. . .

(e) Costs
The court, in issuing any final order in any action brought pursuant to this section or section 6976 of this title, *may award* costs of litigation (including *reasonable attorney* and expert witness *fees* ) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate. . . .
42 U.S.C.A. § 6972 (emphases added.)
Citizen suits.

. . .

(d) Litigation costs
The court, in issuing any final order in any action brought pursuant to this section, *may award* costs of litigation (including *reasonable attorney* and expert witness *fees* ) to any prevailing or substantially prevailing party, *whenever the court determines such award is appropriate.* . . .
33 U.S.C.A. § 1365 (emphases added.)

**94.** In *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524 (3d Cir.1997), the Third Circuit Court of Appeals held that under a Pennsylvania fee-shifting statute, courts can consider the contingent risk of a particular case in calculating a reasonable fee. *See id.* at 535. The court based its decision on the fact that courts assessing fees under the Pennsylvania fee-shifting statute are guided by Pennsylvania Rule of Civil Procedure Rule 1716, which provides that "[i]n all cases where the court is authorized under applicable law to fix the amount of counsel fees it *shall* consider, among other things, . . . whether the receipt of a fee was contingent on success." *Id.* at 532 (emphasis added).

██ Furthermore, a contingency fee agreement itself is insufficient to ensure enforcement of such laws because many statutes with fee-shifting provisions "will generate either no damages or only small recoveries; accordingly, plaintiffs bringing cases under these statutes cannot offer attorneys a share of a recovery sufficient to justify a standard contingent-fee arrangement." *Dague,* 505 U.S. at 568, 112 S.Ct. 2638 (Blackmun, J., dissenting) (citations omitted).

██ Most significantly, "fee award statutes exist to enable people with valid claims to shop for lawyers in the same ways that people who have money and rights to damage awards do so," and "contingency enhancements enable parties to compete effectively for lawyers' time in markets where other bidders offer certain fees and contingent fees that offset nonpayment risks." Silver, *Incoherence and Irrationality,* 12 Rev. Litig. at 317–18. For example, "[u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *Blanchard,* 489 U.S. at 96, 109 S.Ct. 939 (internal quotation marks and citations omitted). "[F]orbidding the shifting of compensation for risk could deter the bringing of such cases." Rowe, *The Legal Theory,* Duke L.J. at 676 (footnote omitted).

Additionally, we disagree with the reasoning in opposing case law and commentary. For example, the *Dague* majority and *Delaware Valley II* principal opinion fear enhancement would penalize defendants who have the strongest cases. *See Dague,* 505 U.S. at 567, 112 S.Ct. 2638; *Delaware Valley II,* 483 U.S. at 725, 107 S.Ct. 3078.[95] But, as the dissenters in *Dague* and *Delaware Valley II* explain, contingency enhancements are based on a risk of nonpayment associated with contingent employment, not the relative likelihood of success in a particular case.

*See Dague,* 505 U.S. at 570, 112 S.Ct. 2638 (Blackmun, J., dissenting); *Delaware Valley II,* 483 U.S. at 746–47, 107 S.Ct. 3078 (Blackmun, J., dissenting). Furthermore, in our view, contingency enhancement would not result in compensation for cases lost by plaintiff's counsel as posited by the *Dague* majority and the *Delaware Valley II* principal opinion. *See Dague,* 505 U.S. at 565, 112 S.Ct. 2638; *Delaware Valley II,* 483 U.S. at 725, 107 S.Ct. 3078. "The absence of any link to time spent on losing cases" is demonstrated by the fact that

> contingency enhancements ... bear no necessary relation to the amount of a time a lawyer may have spent on matters that were lost. A lawyer who loses ninety-nine cases before eking out a win receives the same percentage enhancement in the successful case as a lawyer who wins one hundred times in a.row. And a lawyer who invests zero hours in losing efforts— for example, a lawyer who accepts only one fee award case and wins—receives the same percentage enhancement as a lawyer who wastes 1000 hours of time.... Contingency enhancements merely compensate lawyers at market rates for services lawyers provide to clients who win.

Silver, *Incoherence and Irrationality,* 12 Rev. Litig. at 332 (footnote omitted).

██ Finally, we regard the merits of contingent enhancements as outweighing possible related problems. The *Dague* majority believed that elimination of contingency enhancements avoids "burdensome satellite litigation." 505 U.S. at 566, 112 S.Ct. 2638. "It is easy to understand, of course, the majority's wish to avoid drawn-out litigation over attorneys' fees." *Fee Enhancement,* 106 Harv. L.Rev. at 347. However, "[t]he price of avoiding the problem completely, which Justice Scalia accomplished by eliminating contingency enhancements, is to place all victims who have only fee awards to offer at a disadvantage in the competition for lawyers'

95. *See also* J. Kole, *Nonpayment Risk Multipliers: Incentives or Windfalls?,* 53 U. Chi. L.Rev. 1074, 1093–94 (1986) [hereinafter *Nonpayment Risk Multipliers* ] (contending that "to reward the plaintiff's attorney for bearing quality-rated risks effectively penalizes defendants for obtaining high quality counsel and vigorously defending their positions" and that awarding higher enhancements based on the strength of a case's legal merits "would force the least culpable defendants to pay higher attorney's fee awards than the most egregious offenders") (footnotes omitted).

time." Silver, *Incoherence and Irrationality*, 12 Rev. Litig. at 328 (footnotes omitted). Moreover, by requiring trial courts to follow guidelines we provide, *see* discussion *infra* part XXII, windfalls from contingency enhancement [96] can, to a great extent, be eliminated. Even if such guidelines cannot eliminate windfalls completely,

> [w]hy should the interest guilty defendants have in saving money trump the interest plaintiffs with meritorious claims have in retaining counsel? Guilty defendants can often avoid liability for fees entirely by refraining from wrongful conduct. Those who fail to do so have little standing to complain. . . . [T]he primary purpose of fee award statues is to help plaintiffs with meritorious claims obtain relief from guilty defendants. It is therefore better to construe the statutes in a manner that creates incentives for lawyers to represent plaintiffs who have sufficiently strong claims than to worry about protecting defendants who violate . . . laws from marginal overpayments.

Silver, *Incoherence and Irrationality*, 12 Rev. Litig. at 328–29 (footnotes omitted). *See also* Rowe, *The Legal Theory*, 1982 Duke L.J. at 676 (stating that it is "defensible . . . to extract some risk compensation from losing defendants . . . rather than denying it entirely or leaving lawyers to seek it from their winning clients") (footnote omitted). *But see* Kole, *Nonpayment Risk Multipliers*, 53 U. Chi. L.Rev. at 1077 (stating that when "the desire to encourage lawyers to represent indigent civil rights plaintiffs [is] balanced against the dangers of providing windfalls to attorneys, encouraging frivolous claims, and generating litigation over attorney's fees[,] . . . the policy arguments weigh against the use of contingency multipliers").

■ Therefore, we conclude that ensuring enforcement of statutes with fee-shifting provisions outweighs concerns about satellite litigation over attorneys' fees, filings of frivolous claims, and windfalls for attorneys that possibly may result. We note that this holding applies only to statutes with fee-shifting provisions enacted to "encourage the enforcement of . . . law through lawsuits filed by private persons." *Delaware Valley II*, 483 U.S. at 737, 107 S.Ct. 3078 (Blackmun, J., dissenting). For example, the holding is inapplicable to attorney's fees under HRS § 607–14 (1993), which authorizes courts to award reasonable attorney's fees to the prevailing party "in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee."

### XXII.

In determining whether or not to enhance the lodestar amount and, if so, the amount of enhancement, trial courts must determine: (1) whether "an attorney has taken a case on a contingent basis," *Delaware Valley II*, 483 U.S. at 748, 107 S.Ct. 3078 (2) whether "[the] attorney has been able to mitigate the risk of nonpayment in any way," *id.*, and (3) whether other factors besides the risk of nonpayment also justify enhancement.[97]

A court must first determine whether a case was taken on a contingency basis because "[i]f a client has contracted to pay the 'lodestar' fee . . . , regardless of the outcome of the case, and has paid the attorney on a continuing basis, then the attorney has clearly avoided the risk of nonpayment and enhancement is not appropriate." *Id.* (citations omitted).

If it is determined that a plaintiff's counsel was retained on a contingency fee basis, the

**96.** *See Dague*, 505 U.S. at 565, 112 S.Ct. 2638 (stating that contingency enhancement calculated on any class-wide basis will overcompensate attorneys in "all cases having above-class-average chance of success"); Kole, *Nonpayment Risk Multipliers*, 53 U. Chi. L.Rev. at 1096 (stating that "uniform risk compensation will be overinclusive and may thus result in windfalls").

**97.** We concur with *Delaware Valley II*'s dissent and hold that to "determin[e] when, and to what

degree, enhancement is appropriate in calculating a statutory attorney's fee," 483 U.S. at 748, 107 S.Ct. 3078 (Blackmun, J., dissenting), "a [trial] court's job simply will be to determine whether a case was taken on a contingent basis, whether the attorney was able to mitigate the risk of nonpayment in any way, and whether other economic risks were aggravated by the contingency of payment." *Id.* at 747, 107 S.Ct. 3078.

court must then determine whether any factors mitigate the risk of nonpayment.[98] *See id.* Examples of such mitigating factors include a client's agreement to pay some portion of the lodestar amount, regardless of the outcome of the case,[99] *see id.* at 748–49, 107 S.Ct. 3078 (citing *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 686 (N.D.Cal.1974) (client agreed to pay $5,000 retainer and to undertake fundraising effort, but attorneys clearly not guaranteed payment for most of the hours expended), *disapproved of by Delaware Valley II,* 483 U.S. at 724, 107 S.Ct. 3078), or "a contingent-fee contract in a suit seeking substantial damages."[100] *Id.* at 749, 107 S.Ct. 3078.

Finally, trial courts may consider other factors pertaining to contingency fee agreements, including whether "a case involve[d] an issue of public importance," "the

plaintiff's ... unpopular[ity] in the community," or the "defendant['s] ... obstreperous[ness.]"[101] *Id.* at 716, 107 S.Ct. 3078. "[E]vidence in the record ... that without risk enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market," *id.* at 731, 107 S.Ct. 3078, indicates that an enhanced amount would represent "reasonable" attorneys' fees which "would attract competent counsel[.]" *Dague,* 505 U.S. at 575, 112 S.Ct. 2638 (O'Connor, J., dissenting) (internal quotation marks and citation omitted).

It has been observed that "contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar."[102] *Rendine,* 661 A.2d at 1231.

**98.** By requiring trial courts to consider mitigating factors, we reject the across-the-board approach, which allows enhancement of the lodestar fee based on the risk of nonpayment in all contingency fee cases. *See* Silver, *Incoherence and Irrationality,* 12 Rev. Litig. at 324–36 (arguing for the adoption of the across-the-board approach). The fact that almost all contingency fee cases bear the risk of nonpayment, *see Dague,* 505 U.S. at 565, 112 S.Ct. 2638 (stating that "we perceive no ... basis, ... by which contingency enhancement, if adopted, could be restricted to fewer than all contingent-fee cases"); *Third Circuit Report,* 108 F.R.D. at 265 (stating that "[p]laintiffs' attorneys always factor the prospect of receiving no compensation in statutory fee cases"), does not justify enhancement in all contingency fee cases. Under certain circumstances, the risk of nonpayment can be mitigated, making enhancement inappropriate.

**99.** In such a case, "the percentage of total expenses paid by the client will indicate how much of a mitigating factor this contribution should be considered to be." *Delaware Valley II,* 483 U.S. at 748–49, 107 S.Ct. 3078.

**100.** The term "substantial damages" is defined as "[c]onsiderable in amount and intended as a real compensation for a real injury." *Black's Law Dictionary* 392. In this situation, an attorney "mitigate[s] the risk to some extent by exchanging the risk of nonpayment for the prospect of compensation greater than the prospective lodestar amount." *Delaware Valley II,* 483 U.S. at 749, 107 S.Ct. 3078.

"Even in such cases, of course, a court must still calculate a reasonable attorney's fee to be assessed against the defendant. There is no reason to grant a defendant a 'windfall' by excusing

payment of attorney's fees simply because a plaintiff has entered into a contingent-fee contract." *Id.* (citing *Hamner v. Rios,* 769 F.2d 1404, 1408–10 (9th Cir.1985); *Sargeant v. Sharp,* 579 F.2d 645, 649 (1st Cir.1978)).

**101.** In *Delaware Valley II,* the principal opinion specifically noted that it did not consider the matter of delay and undesirability of a particular case or a case with public importance in reaching its decision because in its view, those factors were irrelevant to the risk of nonpayment. *See* 483 U.S. at 716, 107 S.Ct. 3078.

**102.** " '[A] total multiplier of 2, representing all enhancing factors, appears typically to have been applied as a ceiling in public interest litigation.' " *Rendine,* 661 A.2d at 1230 (quoting 2 M. Derfner & A. Wolf, *Court Awarded Attorney Fees,* ¶ 16.04[4][a], at 16–157 n. 151 (rev. ed.1990) (citing *Kelley v. Metropolitan County Bd. of Educ.,* 773 F.2d 677 (6th Cir.1985) (*en banc* ), *cert. denied,* 474 U.S. 1083, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986) (multiplier of 1.25 for contingency); *Vaughns v. Board of Educ. of Prince George's County,* 770 F.2d 1244 (4th Cir.1985) (multiplier of 1.075 for contingency); *Sierra Club v. Clark,* 755 F.2d 608 (8th Cir.1985) (multiplier of 1.3 for contingency, difficulty, and result); *Craik v. Minnesota State Univ. Bd.,* 738 F.2d 348 (8th Cir.1984) (multiplier of 1.25 for contingency))). Furthermore, according to the American Bar Association,

[o]f the 26 post-*Blum v. Stenson* cases awarding risk-based enhancement under Section 1288 ..., enhancement of 100% is the maximum reported, and the unweighted average of all enhancement factors employed was only approximately 32%. Similarly, in *Wildman v.*

We observe that a multiplier of two, which Plaintiff's counsel requests, "will be appropriate only in the rare and exceptional case in which the risk of nonpayment has not been mitigated at all, *i.e.*, where the 'legal' risk constitutes 'an economic disincentive independent of that created by the basic contingency in payment [and] the result achieved is significant and of broad public interest.'" *Id.* (quoting *Delaware Valley II*, 483 U.S. at 751, 107 S.Ct. 3078 (Blackmun, J., dissenting)). "Enhancements of that magnitude [should] be reserved for cases ... in which no prospect existed for the attorney to be compensated by payment of a percentage of a large damages award, and in which the relief sought was primarily equitable in nature". *Id.* Furthermore, "a total multiplier of [two], representing all enhancing factors, appears typically to have been applied as a ceiling in public interest litigation." *Id.* at 1230 (quoting 2 M. Derfner & A. Wolf, *Court Awarded Attorney Fees*, ¶ 16.04[4][a], at 16–157 n. 151 (rev. ed.1990) (citations omitted)). In this case, Plaintiff was seeking substantial damages and the result achieved cannot be said to be of such "significant and ... broad interest" as to justify a multiplier of two. *Rendine*, 661 A.2d at 1231 (internal quotation marks and citation omitted).

## XXIII.

Because we conclude the court erred in applying *Dague*, we vacate its September 2, 1997 order as to the attorney's fee award and remand for a determination of whether the fees to be awarded should be enhanced because of the contingent fee arrangement.

## XXIV.

■ Plaintiff argues that the court erred in denying paralegal fees and costs, sales tax

*Lerner Stores Corp.*, 771 F.2d 605, 613 (1st Cir.1985), the First Circuit observed that during 1980–1985, for civil rights cases, enhancement of 100% was the maximum reported, and that enhancements of such magnitude had been awarded only three times.
*Id.* at 1230–31.

103. The hearing was on Plaintiff's motion for attorney's fees and costs and Defendant's motion for new trial.

104. *See supra* note 93.

on expenses, parking, and a June 27, 1997 hearing transcript.[103] An award or denial of costs is reviewed under the abuse of discretion standard. *See Pancakes of Hawaii, Inc. v. Pomare Properties Corp.*, 85 Hawai'i 286, 298, 944 P.2d 83, 95 (App.1997) (citations omitted).

### A.

■ As to paralegal fees, Plaintiff appears to be making two arguments. First, Plaintiff contends that the words "costs of fees of any nature" in HRS §§ 378–5(c) and 388–11(c) include paralegal costs. Plaintiff cites *Pancakes* to support his first argument. However, the basis for granting paralegal fees in *Pancakes* was contractual and not statutory. *See id.* at 298–99, 944 P.2d at 95–96. Alternatively, Plaintiff asserts that the paralegal costs should be included in the lodestar as part of the attorney's fees.

As to Plaintiff's second argument, we observe that federal statutes authorize an award of a "reasonable attorney's fee" to a prevailing party or prevailing plaintiff. Plaintiff cites *Jenkins, supra*, and *Feher v. Department of Labor & Indus. Relations*, 561 F.Supp. 757 (D.Haw.1983), for the proposition that paralegal fees should be included in the attorney's fees.

The federal equivalents of HRS § 378–5(c) are 42 U.S.C. § 1988[104] (allowing award of attorneys' fees in §§ 1981 and 1983 cases), 42 U.S.C. § 2000e–5(k)[105] (allowing award of attorneys' fees in Title VII and Americans with Disabilities Act cases), and 29 U.S.C. § 216(b) (1998)[106] (allowing award of attorneys' fees in ADEA and EPA cases). Furthermore, the federal equivalent of § 388–

105. *See supra* note 93.

106. 29 U.S.C. § 216(b) provides in pertinent part as follows:

(b) Damages; right of action; attorney's fees and costs; termination of right of action

. . . .

The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a *reasonable attorney's fee* to be paid by the defendant, *and costs* of the action.

11(c) is 29 U.S.C. § 216(b) (allowing award of attorney's fees in Fair Labor Standards Act cases).

In *Jenkins,* plaintiffs in a school desegregation case were awarded attorney's fees. The court held that the district court properly awarded compensation for the work of paralegals, law clerks, and recent law graduates under 42 U.S.C. § 1988. *See* 491 U.S. at 289, 109 S.Ct. 2463. Affirming compensation for "paralegals" (as used by the court the term included all three groups), the Court construed "reasonable attorney's fees" as including all services which contribute to the attorney's work product, because the term reasonable attorney's fee "must refer to a reasonable fee for the work product of an attorney":

> We begin with the statutory language, which provides simply for "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. Clearly, a "reasonable attorney's fee" cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of an attorney. *Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills [his or] her client;* and it must also take account of other expenses and profit. The parties have suggested no reason why the work of paralegals should not be similarly compensated, nor can we think of any. *We thus take as our starting point the self-evident proposition that the "reasonable attorney's fee" provided for by statute should compensate the work of paralegals, as well as that of attorneys.*

*Id.* at 285, 109 S.Ct. 2463 (emphases added).

In valuing the attorney's "work product," a trial court must look to the relevant market. "A reasonable attorney's fee under § 1988 is one calculated on the basis of rates and practices prevailing in the relevant market, *i.e.,* in line with those rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* at 286, 109 S.Ct. 2463 (internal quotation marks, citation, and brackets omitted). Consequently, the trial court must determine whether it is the custom of the relevant community [107] to bill for such services as part of the attorney's fees or as a separate cost item. "The attorney who bills separately for paralegal time is merely distributing [his or] her costs and profit margin among the hourly fees of other members of [his or] her staff, rather than concentrating them in the fee [he or] she sets for [his or] her own time." *Id.* at 287 n. 8, 109 S.Ct. 2463.

Also, the Court indicated that the custom or practice in the relevant community would determine whether paralegal costs should be billed at the cost to the attorney involved or at market rates. According to the Court,

> [i]f it is the practice in the relevant market not to [bill the work of paralegals separately], or to bill the work of paralegals only at cost, that is all that § 1988 requires. Where … the prevailing practice is to bill paralegal work at market rates, … civil rights lawyers' fee requests [must be treated] in the same way….

*Id.* at 288, 109 S.Ct. 2463 (internal quotation marks and citations omitted). The holding of *Jenkins* has been applied to other statutes pertaining to "reasonable attorneys' fees" and a "prevailing party." *See Chambless,* 885 F.2d at 1058 (stating that "the Supreme Court instructs us that the same standards [as *Jenkins*] apply to other fee-shifting statutes where an award is made to the prevailing party") (citing *Hensley,* 461 U.S. at 433 n. 7, 103 S.Ct. 1933). *See also D'Emanuele v. Montgomery Ward & Co., Inc.,* 904 F.2d 1379, 1387 (9th Cir.1990) (applying the *Jenkins* holding to attorney's fees in an ERISA

---

107. Under federal authority, the "relevant community" is "typically … the community 'in which the district court sits.'" *Schwarz v. Secretary of Health & Human Servs.,* 73 F.3d 895, 906 (9th Cir.1995) (quoting *Davis v. Mason County,* 927 F.2d 1473, 1488 (9th Cir.), *cert. denied,* 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991)). We adopt this definition by analogy, and, thus, the relevant community in Hawai'i state cases would be "the community in which the [circuit] court sits." *Id.* (internal quotation marks and citation omitted). In this case, the relevant community is the island of O'ahu.

action pursuant to 29 U.S.C. § 1132(g)), *abrogated by Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449; *United States Football League v. National Football League*, 887 F.2d 408, 416–17 (2d Cir.1989) (holding that an hourly market rate for paralegal services can be included in the attorney fees award under the Clayton Act, 15 U.S.C. § 15), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990).

In *Feher*, the district court held that under 42 U.S.C. § 2000e–5(k), a plaintiff was entitled to interim attorney's fees and that paralegal fees should be included in the lodestar because "using paralegals or law clerks is cost-efficient and should be encouraged," "the work of paralegals and law clerks, if performed by a lawyer, would have been more costly," and "traditionally, private firms in the Honolulu area bill clients for paralegal services." 561 F.Supp. at 766.

Unlike the situation in two state cases where the courts chose not to follow *Jenkins*, *see Hines v. Hines*, 129 Idaho 847, 934 P.2d 20, 28 (1997), and *Johnson v. Naugle*, 557 N.E.2d 1339, 1344–45 (Ind.Ct.App.1990), HRS §§ 378–5(c), 388–11(c), our court rules do not specify what can be included in the attorney's fees award in this case. Our statutes allow recovery of "costs of action, including costs of fees of any nature and reasonable attorney's fees," HRS §§ 378–5(c), 388–11(c), and thus are sufficiently inclusive to authorize an award of paralegal fees as part of the attorney's fees. Thus, this court has recently held that, "*in appropriate cases*, a request or award of attorneys' fees may include compensation for separately billed legal services performed by a paralegal, legal assistant, or law clerk[.]" *Blair v. Ing*, 96 Hawai'i 327, 31 P.3d 184, 191 (2001) (emphasis in original). We adhere to the rationale that if reasonable compensation requires it, a prevailing party must be compensated for paralegal costs.

Because "encouraging the use of lower cost paralegals rather than attorneys wherever possible ... 'encourages cost effective delivery of legal services[,]'" *Jenkins*, 491 U.S. at 288, 109 S.Ct. 2463 (quoting *Cameo Convalescent Center, Inc. v. Senn*, 738 F.2d 836, 846 (7th Cir.1984), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985)), the expected cost savings should be reflected in the amount of attorney's fees conferred. *See Blair*, at 191. Courts should reduce an award of attorney's fees for excessive preparation time by the paralegal, duplicative efforts by the attorney and paralegal, and performance of clerical functions. *See In re Maruko, Inc.*, 160 B.R. 633 (S.D.Cal. 1993); *Decibus v. Woodbridge Township Police Dept.*, No. 88–2926, 1991 WL 59428 (D.N.J. April 15, 1991) ("[R]ates should be in direct correlation to the task performed.") Furthermore, where there is no documentation for paralegal time, courts can decline to make any award. *See Anderson v. Secretary of Health & Human Serv.*, 80 F.3d 1500, 1507 (10th Cir.1996) (The record revealed no documentation for paralegal time other than lead counsel's estimate.).

For the foregoing reasons, we remand the question of an award of paralegal fees to the court to determine whether it is the prevailing practice in the relevant community to bill paralegal work at the actual cost to the attorney or at market rates, and in what amount, if any, Plaintiff should be compensated for his paralegal costs.

## B.

To support his argument that the court erred in denying his request for the other costs, Plaintiff points to the language of HRS §§ 378–5(c), 388–11(c), and 607–9 (1993). HRS §§ 378–5(c) and 388–11(c) provide in part that the court "shall allow costs of action, including costs of fees of any nature ... to be paid by the defendant." HRS § 607–9 provides as follows:

> **Cost charges exclusive; disbursements.** No other costs of court shall be charged in any court in addition to those prescribed in this chapter in any suit, action, or other proceeding, except as otherwise provided by law.
>
> *All actual disbursements, including but not limited to*, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance tele-

phone charges, and postage, sworn to by an attorney or a party, and *deemed reasonable by the court, may be allowed* in taxation of costs. *In determining whether and what costs should be taxed, the court may consider the equities of the situation.* (Emphases added.) To respond to Defendants' argument that the list under HRS § 607–9 does not include the costs Plaintiff is seeking, Plaintiff relies on the words "including but not limited to," in that statute.

▮ The phrase, "costs of fees of any nature," is subject to HRS § 607–9 and does not mean a prevailing party is awarded any costs the party requests. *See Collins v. South Seas Jeep Eagle*, 87 Hawai'i 86, 90, 952 P.2d 374, 378 (1997) (stating that "[a]llowable taxable 'costs' are defined in [HRS] § 607–9" in the context of HRS § 378–5(c)). HRS § 607–9 gives courts discretion in determining what costs should be awarded. However, the court denied the requested costs without any explanation.

This court has held that the trial court abused its discretion in reducing the amount of taxable costs awarded "without explanation or a readily discernable rationale." *Finley v. Home Ins. Co.*, 90 Hawai'i 25, 38, 975 P.2d 1145, 1158 (1998). *See also Wong v. Takeuchi*, 88 Hawai'i 46, 52, 961 P.2d 611, 617 (stating that " 'the court may not deny costs to the prevailing party without explanation, unless the circumstances justifying denial of costs are plain from the record' ") (quoting 10 *Moore's Federal Practice* § 54.101(1)(a-b) (3d ed.1998)) (other citation

omitted), *reconsideration denied*, 88 Hawai'i 46, 961 P.2d 611 (1998); HRCP Rule 54(d)(1) (stating that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs"). Since the court did not explain its ruling, and its reasons for doing so are not readily discernible, we vacate its September 2, 1997 order as to its ruling on the costs claimed and remand for the court's "explanation." *Finley*, 90 Hawai'i at 38, 975 P.2d 1158.

### XXV.

Based on the foregoing, we affirm (1) the jury's award for unpaid wages and the penalty thereon, (2) the jury's punitive damage award, and (3) the court's April 16, 1997 order granting Defendants' motion for directed verdict as to Plaintiff's compensation discrimination claim. We vacate $336 of the jury's award of $4,536 to Pacific for unpaid loans. We vacate and remand to the court for disposition in accordance with this opinion (1) the court's April 16, 1997 order granting Defendants' motion for directed verdict as to individual liability of Fred and Jonathan and (2) the court's September 2, 1997 order awarding attorney's fees and denying certain costs.

